(Slip Opinion) OCTOBER TERM, 2021 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BIDEN ET AL. *v*. TEXAS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 21–954. Argued April 26, 2022—Decided June 30, 2022

In January 2019, the Department of Homeland Security began to implement the Migrant Protection Protocols (MPP). Under MPP, certain non-Mexican nationals arriving by land from Mexico were returned to Mexico to await the results of their removal proceedings under section 1229a of the Immigration and Nationality Act (INA). MPP was implemented pursuant to a provision of the INA that applies to aliens "arriving on land . . . from a foreign territory contiguous to the United States" and provides that the Secretary of Homeland Security "may return the alien to that territory pending a proceeding under section 1229a." 8 U. S. C. §1225(b)(2)(C). Following a change in Presidential administrations, the Biden administration announced that it would suspend the program, and on June 1, 2021, the Secretary of Homeland Security issued a memorandum officially terminating it.

The States of Texas and Missouri (respondents) brought suit in the Northern District of Texas against the Secretary and others, asserting that the June 1 Memorandum violated the INA and the Administrative Procedure Act (APA). The District Court entered judgment for respondents. The court first concluded that terminating MPP would violate the INA, reasoning that section 1225 of the INA "provides the government two options" with respect to illegal entrants: mandatory detention pursuant to section 1225(b)(2)(A) or contiguous-territory return pursuant to section 1225(b)(2)(C). 554 F. Supp. 3d 818, 852. Because the Government was unable to meet its mandatory detention obligations under section 1225(b)(2)(A) due to resource constraints, the court reasoned, terminating MPP would necessarily lead to the systemic violation of section 1225 as illegal entrants were released into the United States. Second, the District Court concluded that the June 1 Memorandum was arbitrary and capricious in violation of the APA.

The District Court vacated the June 1 Memorandum and remanded to
DHS. It also imposed a nationwide injunction ordering the Govern-
ment to "enforce and implement MPP *in good faith* until such a time
as it has been lawfully rescinded in compliance with the APA **and** until
such a time as the federal government has sufficient detention capac-
ity to detain all aliens subject to mandatory detention under [section
1225] without releasing any aliens *because of* a lack of detention re-
sources." *Id.*, at 857 (emphasis in original).

   While the Government's appeal was pending, the Secretary released
the October 29 Memoranda, which again announced the termination
of MPP and explained anew his reasons for doing so. The Government
then moved to vacate the injunction on the ground that the October 29
Memoranda had superseded the June 1 Memorandum. But the Court
of Appeals denied the motion and instead affirmed the District Court's
judgment in full. With respect to the INA question, the Court of Ap-
peals agreed with the District Court's analysis that terminating the
program would violate the INA, concluding that the return policy was
mandatory so long as illegal entrants were being released into the
United States. The Court of Appeals also held that "[t]he October 29
Memoranda did not constitute a new and separately reviewable 'final
agency action.' " 20 F. 4th 928, 951.

*Held*: The Government's rescission of MPP did not violate section 1225
of the INA, and the October 29 Memoranda constituted final agency
action. Pp. 8–25.

   (a) Beginning with jurisdiction, the injunction that the District
Court entered in this case violated 8 U. S. C. §1252(f )(1). See *Garland*
v. *Aleman Gonzalez*, 596 U. S. ___, ___. But section 1252(f )(1) does not
deprive *this* Court of jurisdiction to reach the merits of an appeal even
where a lower court enters a form of relief barred by that provision.
Section 1252(f )(1) withdraws a district court's "jurisdiction or author-
ity" to grant a particular form of relief. It does not deprive lower courts
of all subject matter jurisdiction over claims brought under sections
1221 through 1232 of the INA.

   The text of the provision makes that clear. Section 1252(f )(1) de-
prives courts of the power to issue a specific category of remedies: those
that "enjoin or restrain the operation of " the relevant sections of the
statute. And Congress included that language in a provision whose
title—"Limit on injunctive relief "—makes clear the narrowness of its
scope. Moreover, the provision contains a parenthetical that explicitly
preserves this Court's power to enter injunctive relief. If section
1252(f )(1) deprived lower courts of subject matter jurisdiction to adju-
dicate any non-individual claims under sections 1221 through 1232, no
such claims could ever arrive at this Court, rendering the specific
carveout for Supreme Court injunctive relief nugatory.

Statutory structure likewise confirms this conclusion. Elsewhere in section 1252, where Congress intended to deny subject matter jurisdiction over a particular class of claims, it did so unambiguously. See, *e.g.,* §1252(a)(2) (entitled "Matters not subject to judicial review"). Finally, this Court previously encountered a virtually identical situation in *Nielsen* v. *Preap*, 586 U. S. \_\_\_, and proceeded to reach the merits of the suit notwithstanding the District Court's apparent violation of section 1252(f )(1). Pp. 8–13.

(b) Turning to the merits, section 1225(b)(2)(C) provides: "In the case of an alien . . . who is arriving on land . . . from a foreign territory contiguous to the United States, the [Secretary] may return the alien to that territory pending a proceeding under section 1229a." Section 1225(b)(2)(C) plainly confers a *discretionary* authority to return aliens to Mexico. This Court has "repeatedly observed" that "the word 'may' *clearly* connotes discretion." *Opati* v. *Republic of Sudan*, 590 U. S. \_\_\_, \_\_\_.

Respondents and the Court of Appeals concede that point, but urge an inference from the statutory structure: because section 1225(b)(2)(A) makes detention mandatory, they argue, the otherwise-discretionary return authority in section 1225(b)(2)(C) becomes mandatory when the Secretary violates that mandate. The problem is that the statute does not say anything like that. The statute says "may." If Congress had intended section 1225(b)(2)(C) to operate as a mandatory cure of any noncompliance with the Government's detention obligations, it would not have conveyed that intention through an unspoken inference in conflict with the unambiguous, express term "may." The contiguous-territory return authority in section 1225(b)(2)(C) is discretionary—and remains discretionary notwithstanding any violation of section 1225(b)(2)(A).

The historical context in which section 1225(b)(2)(C) was adopted confirms the plain import of its text. Section 1225(b)(2)(C) was added to the statute more than 90 years after the "shall be detained" language that appears in section 1225(b)(2)(A). And the provision was enacted in response to a BIA decision that had questioned the legality of the contiguous-territory return practice. Moreover, since its enactment, every Presidential administration has interpreted section 1225(b)(2)(C) as purely discretionary, notwithstanding the consistent shortfall of funds to comply with section 1225(b)(2)(A).

The foreign affairs consequences of mandating the exercise of contiguous-territory return likewise confirm that the Court of Appeals erred. Interpreting section 1225(b)(2)(C) as a mandate imposes a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico, one that Congress likely did not intend section 1225(b)(2)(C) to impose. And finally, the availability of parole as an

alternative means of processing applicants for admission, see 8 U. S. C. §1182(d)(5)(A), additionally makes clear that the Court of Appeals erred in holding that the INA required the Government to continue implementing MPP. Pp. 13–18.

(c) The Court of Appeals also erred in holding that "[t]he October 29 Memoranda did not constitute a new and separately reviewable 'final agency action.' " 20 F. 4th, at 951. Once the District Court vacated the June 1 Memorandum and remanded to DHS for further consideration, DHS had two options: elaborate on its original reasons for taking action or " 'deal with the problem afresh' by taking *new* agency action." *Department of Homeland Security* v. *Regents of Univ. of Cal.*, 591 U. S. ___, ___. The Secretary selected the second option from *Regents*: He accepted the District Court's vacatur and dealt with the problem afresh. The October 29 Memoranda were therefore final agency action for the same reasons that the June 1 Memorandum was final agency action: Both "mark[ed] the 'consummation' of the agency's decisionmaking process" and resulted in "rights and obligations [being] determined." *Bennett* v. *Spear*, 520 U. S. 154, 178.

The various rationales offered by respondents and the Court of Appeals in support of the contrary conclusion lack merit. First, the Court of Appeals erred to the extent it understood itself to be reviewing an abstract decision apart from the specific agency actions contained in the June 1 Memorandum and October 29 Memoranda. Second, and relatedly, the October 29 Memoranda were not a mere *post hoc* rationalization of the June 1 Memorandum. The prohibition on *post hoc* rationalization applies only when the agency proceeds by the first option from *Regents*. Here, the Secretary chose the second option from *Regents* and "issue[d] a new rescission bolstered by new reasons absent from the [June 1] Memorandum." 591 U. S., at ___. Having returned to the drawing table, the Secretary was not subject to the charge of *post hoc* rationalization.

Third, respondents invoke *Department of Commerce* v. *New York*, 588 U. S. ___. But nothing in this record suggests a "significant mismatch between the decision the Secretary made and the rationale he provided." *Id.*, at ___. Relatedly, the Court of Appeals charged that the Secretary failed to proceed with a sufficiently open mind. But this Court has previously rejected criticisms of agency closemindedness based on an identity between proposed and final agency action. See *Little Sisters of the Poor Saints Peter and Paul Home* v. *Pennsylvania*, 591 U. S. ___, ___. Finally, the Court of Appeals erred to the extent it viewed the Government's decision to appeal the District Court's injunction as relevant to the question of the October 29 Memoranda's status as final agency action. Nothing prevents an agency from undertaking new agency action while simultaneously appealing an adverse

Syllabus

judgment against its original action.  Pp. 18–25.

20 F. 4th 928, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which BREYER, SOTOMAYOR, KAGAN, and KAVANAUGH, JJ., joined.  KAVANAUGH, J., filed a concurring opinion.  ALITO, J., filed a dissenting opinion, in which THOMAS and GORSUCH, JJ., joined.  BARRETT, J., filed a dissenting opinion, in which THOMAS, ALITO, and GORSUCH, JJ., joined as to all but the first sentence.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order that
corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 21–954

JOSEPH R. BIDEN, JR., PRESIDENT OF THE UNITED
STATES, ET AL., PETITIONERS *v.* TEXAS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 30, 2022]

CHIEF JUSTICE ROBERTS delivered the opinion of the
Court.

In January 2019, the Department of Homeland Secu-
rity—under the administration of President Trump—estab-
lished the Migrant Protection Protocols.  That program pro-
vided for the return to Mexico of non-Mexican aliens who
had been detained attempting to enter the United States
illegally from Mexico.  On Inauguration Day 2021, the new
administration of President Biden announced that the pro-
gram would be suspended the next day, and later that year
sought to terminate it.  The District Court and the Court of
Appeals, however, held that doing so would violate the Im-
migration and Nationality Act, concluding that the return
policy was mandatory so long as illegal entrants were being
released into the United States.  The District Court also
held that the attempted rescission of the program was in-
adequately explained in violation of the Administrative
Procedure Act.  While its appeal was pending, the Govern-
ment took new action to terminate the policy with a more
detailed explanation.  But the Court of Appeals held that
this new action was not separately reviewable final agency

action under the Administrative Procedure Act.

The questions presented are whether the Government's rescission of the Migrant Protection Protocols violated the Immigration and Nationality Act and whether the Government's second termination of the policy was a valid final agency action.

## I

## A

On December 20, 2018, then-Secretary of Homeland Security Kirstjen Nielsen announced a new program called Remain in Mexico, also known as the Migrant Protection Protocols (MPP). MPP was created in response to an immigration surge at the country's southern border, and a resulting "humanitarian and border security crisis" in which federal immigration officials were encountering approximately 2,000 inadmissible aliens each day. 554 F. Supp. 3d 818, 831 (ND Tex. 2021). MPP provided that certain non-Mexican nationals arriving by land from Mexico would be returned to Mexico to await the results of their removal proceedings under 8 U. S. C. §1229a. On the same day that Secretary Nielsen announced the program, the Government of Mexico agreed that it would cooperate in administering it, on a temporary basis.

MPP was implemented pursuant to express congressional authorization in the Immigration and Nationality Act (INA), which provides that "[i]n the case of an alien . . . who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title." 66 Stat. 163, as added and amended, 8 U. S. C. §1225(b)(2)(C).[1] Prior to the initiation of MPP, the Department of Homeland Security (DHS) and its predecessor

_____

[1] The provision refers to the Attorney General, but the authority it confers has been transferred to the Secretary of Homeland Security. See

agency had "primarily used [§1225(b)(2)(C)] on an ad-hoc basis to return certain Mexican and Canadian nationals" arriving at ports of entry. App. to Pet. for Cert. 273a, n. 12.

A separate provision of the same section of the INA states that if "an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." §1225(b)(2)(A). Due to consistent and significant funding shortfalls, however, DHS has never had "sufficient detention capacity to maintain in custody every single person described in section 1225." *Id.*, at 323a. In light of that fact, the Trump administration chose to implement MPP in part so that "[c]ertain aliens attempting to enter the U. S. illegally or without documentation, including those who claim asylum, will no longer be released into the country, where they often fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim." 554 F. Supp. 3d, at 832.

In January 2019, DHS began implementing MPP, initially in San Diego, California, then in El Paso, Texas, and Calexico, California, and then nationwide. By December 31, 2020, DHS had enrolled 68,039 aliens in the program.

Following the change in Presidential administrations, however, the Biden administration sought to terminate the program. On January 20, 2021, the Acting Secretary of Homeland Security wrote that "[e]ffective January 21, 2021, the Department will suspend new enrollments in [MPP] pending further review of the program. Aliens who are not already enrolled in MPP should be processed under other existing legal authorities." *Id.*, at 836. President Biden also issued Executive Order No. 14010, which directed the new Secretary of Homeland Security, Alejandro N. Mayorkas, to "promptly review and determine whether

_____

*Department of Homeland Security* v. *Thuraissigiam*, 591 U. S. \_\_\_, \_\_\_, n. 3 (2020) (slip op., at 4, n. 3).

to terminate or modify the [MPP] program." 86 Fed. Reg. 8269 (2021).

On June 1, 2021, Secretary Mayorkas issued a memorandum officially terminating MPP (the June 1 Memorandum). In that memorandum, the Secretary noted his determination "that MPP [d]oes not adequately or sustainably enhance border management in such a way as to justify the program's extensive operational burdens and other shortfalls." App. to Pet. for Cert. 351a. He also emphasized that, since its inception, MPP had "played an outsized role in [DHS's] engagement with the Government of Mexico," given the "significant attention that it draws away from other elements that necessarily must be more central to the bilateral relationship." *Id.*, at 357a. For those and other reasons, the Secretary announced that he was "by this memorandum terminating the MPP program," and "direct[ed] DHS personnel to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives or policy guidance issued to implement the program." *Id.*, at 348a–349a.

B

On April 13, 2021, the States of Texas and Missouri (respondents) initiated this lawsuit in the Northern District of Texas against Secretary Mayorkas and others. Respondents' initial complaint challenged the Acting Secretary's January 20 suspension of new enrollments in MPP, but following the June 1 Memorandum, they amended their complaint to challenge the Secretary's June 1 rescission of the entire program. The amended complaint asserted that the June 1 Memorandum violated the INA and the Administrative Procedure Act (APA), 5 U. S. C. §701 *et seq.*, and sought preliminary and permanent injunctive relief, declaratory relief, and vacatur of the rescission pursuant to the APA.

The District Court conducted a one-day bench trial and

entered judgment for respondents. The court first concluded that terminating MPP would violate the INA. It reasoned that section 1225 of the INA "provides the government two options": mandatory detention pursuant to section 1225(b)(2)(A) or contiguous-territory return pursuant to section 1225(b)(2)(C). 554 F. Supp. 3d, at 852. Because the Government was unable to meet its detention obligations under section 1225(b)(2)(A) due to resource constraints, the court concluded, "terminating MPP necessarily leads to the systemic violation of Section 1225 as aliens are released into the United States." *Ibid.* Second, the District Court found that the agency failed to engage in reasoned decisionmaking and therefore acted arbitrarily and capriciously in violation of the APA. *Id.*, at 847–851.

Based on these conclusions, the District Court "vacated [the June 1 Memorandum] in its entirety and remanded to DHS for further consideration." *Id.*, at 857 (boldface and capitalization omitted). And it imposed a nationwide injunction ordering the Government to "enforce and implement MPP *in good faith* until such a time as it has been lawfully rescinded in compliance with the APA **and** until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under [section 1225] without releasing any aliens *because of* a lack of detention resources." *Ibid.* (emphasis in original).

The Government appealed and sought a stay of the injunction, which the District Court and the Court of Appeals each denied. The Government then applied to this Court for a stay. The Court denied the application, finding that the Government "had failed to show a likelihood of success on the claim that the [June 1 Memorandum] was not arbitrary and capricious." 594 U. S. ___ (2021). The Court did not address the District Court's interpretation of the INA.

The parties proceeded to briefing in the Court of Appeals.

While the Government's appeal was pending, however, Secretary Mayorkas "considered anew whether to maintain, terminate, or modify MPP in various ways." App. to Pet. for Cert. 286a. On September 29, 2021, the Secretary publicly announced his "inten[tion] to issue in the coming weeks a new memorandum terminating [MPP]." 20 F. 4th 928, 954 (CA5 2021). The Government then moved to hold the appeal in abeyance pending the Secretary's formal decision, but the Court of Appeals denied the motion.

On October 29, the Secretary released a four-page memorandum that again announced the termination of MPP, along with a 39-page addendum explaining his reasons for doing so (the October 29 Memoranda). As the Secretary explained, this new assessment of MPP "examined considerations that the District Court determined were insufficiently addressed in the June 1 memo, including claims that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, cause [DHS] to fail to comply with alleged detention obligations under the [INA], impose undue costs on states, and put a strain on U. S.-Mexico relations." App. to Pet. for Cert. 259a–260a.

The Secretary acknowledged what he called "the strongest argument in favor of retaining MPP: namely, the significant decrease in border encounters following the determination to implement MPP across the southern border." *Id.*, at 261a. But he nonetheless concluded that the program's "benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives that better align with this Administration's values." *Ibid.* Finally, the Secretary once again noted that "[e]fforts to implement MPP have played a particularly outsized role

in diplomatic engagements with Mexico, diverting atten-
tion from more productive efforts to fight transnational
criminal and smuggling networks and address the root
causes of migration." *Id.*, at 262a.

In light of those conclusions, the Secretary announced
that he was once again "hereby terminating MPP." *Id.*, at
263a. He explained that DHS would "continue complying
with the [District Court's] injunction requiring good-faith
implementation and enforcement of MPP." *Id.*, at 264a.
But he noted that "the termination of MPP" would be "im-
plemented as soon as practicable after a final judicial deci-
sion to vacate" that injunction. *Ibid.* The Government then
moved to vacate the injunction on the ground that the Oc-
tober 29 Memoranda had superseded the June 1 Memoran-
dum, but the Court of Appeals denied the motion.

The Court of Appeals instead affirmed the District
Court's judgment in full. With respect to the INA question,
the Court of Appeals agreed with the District Court's anal-
ysis of the relevant provisions. That is, the court explained,
section 1225(b)(2)(A) "sets forth a general, plainly obliga-
tory rule: detention for aliens seeking admission," while
section 1225(b)(2)(C) "authorizes contiguous-territory re-
turn as an alternative." 20 F. 4th, at 996. Accordingly, the
Court of Appeals reasoned, "DHS is violating (A)'s mandate,
refusing to avail itself of (C)'s authorized alternative, and
then complaining that it doesn't like its options." *Ibid.*,
n. 18.

The Court of Appeals also held that "[t]he October 29
Memoranda did not constitute a new and separately re-
viewable 'final agency action.'" *Id.*, at 951. The Court of
Appeals distinguished "DHS's June 1 decision to terminate
MPP," which it claimed "had legal effect," from the June 1
Memorandum, the October 29 Memoranda, and "any other
subsequent memos," which it held "simply *explained* DHS's
decision." *Ibid.* The Court of Appeals then criticized the
Government for proceeding "without a hint of an intention

to put the Termination Decision back on the chopping block and rethink things," and for ultimately "just further defend[ing] what it had previously decided." *Id.*, at 955. And the Court of Appeals drew a dichotomy between taking new agency action and appealing an adverse decision, asserting that "DHS chose not to take a new agency action" but "instead chose to notice an appeal and defend its Termination Decision in our court." *Id.*, at 941.

We granted certiorari, 595 U. S. ___ (2022), and expedited consideration of this appeal at the Government's request.

## II

We begin with jurisdiction. The Government contends that the injunction the District Court entered was barred by 8 U. S. C. §1252(f )(1). That provision reads as follows:

> "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U. S. C. §§1221–1232], other than with respect to the application of such provisions to an individual alien against whom proceedings under [those provisions] have been initiated."

As we recently held in *Garland* v. *Aleman Gonzalez*, 596 U. S. ___ (2022), section 1252(f )(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.*, at ___ (slip op., at 5). The District Court's injunction in this case violated that provision. But that fact simply presents us with the following question: whether section 1252(f )(1) deprives *this* Court of jurisdiction to reach the merits of an appeal, where the lower court entered a form of relief barred by that provision. See *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 95 (1998)

("Every federal appellate court has an obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it." (internal quotation marks and alterations omitted)).

Absent section 1252(f)(1), the District Court clearly had federal question jurisdiction over respondents' suit, which asserted claims arising under two federal statutes, the INA and the APA. See 28 U. S. C. §1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The question, then, is whether section 1252(f)(1) strips the lower courts of subject matter jurisdiction over these claims. The parties agree that the answer to that question is no, and so do we. That is because section 1252(f)(1) withdraws a district court's "jurisdiction or authority" to grant a particular form of relief. It does not deprive the lower courts of all subject matter jurisdiction over claims brought under sections 1221 through 1232 of the INA.

The text of the provision makes that clear. Section 1252(f)(1) deprives courts of the power to issue a specific category of remedies: those that "enjoin or restrain the operation of" the relevant sections of the statute. A limitation on subject matter jurisdiction, by contrast, restricts a court's "power to adjudicate a case." *United States* v. *Cotton*, 535 U. S. 625, 630 (2002). Section 1252(f)(1) bears no indication that lower courts lack power to hear any claim brought under sections 1221 through 1232. If Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote. But Congress instead provided that lower courts would lack jurisdiction to "enjoin or restrain the operation of" the relevant provisions, and it included that language in a provision whose title—"Limit on injunctive relief"—makes clear the narrowness of its scope.

A second feature of the text of section 1252(f)(1) leaves no doubt that this Court has jurisdiction: the parenthetical explicitly preserving this Court's power to enter injunctive relief. See §1252(f)(1) ("[N]o court (other than the Supreme Court) shall have jurisdiction or authority . . ."). If section 1252(f)(1) deprived lower courts of subject matter jurisdiction to adjudicate any non-individual claims under sections 1221 through 1232, no such claims could ever arrive at this Court, rendering the provision's specific carveout for Supreme Court injunctive relief nugatory. Indeed, that carveout seems directed at precisely the question before us here: whether section 1252(f)(1)'s "[l]imit on injunctive relief" has any consequence for the jurisdiction of this Court. Congress took pains to answer that question in the negative. Interpreting section 1252(f)(1) to deprive this Court of jurisdiction under these circumstances would therefore fail to "give effect, if possible, to every clause and word of [the] statute." *Williams* v. *Taylor*, 529 U. S. 362, 404 (2000).[2]

Statutory structure confirms our conclusion. Elsewhere in section 1252, where Congress intended to deny subject matter jurisdiction over a particular class of claims, it did so unambiguously. Section 1252(a)(2), for instance, is entitled "Matters not subject to judicial review" and provides that "*no court shall have jurisdiction to review*" several categories of decisions, such as "any final order of removal against an alien who is removable by reason of having committed a criminal offense. . . ." (Emphasis added.) Congress could easily have added one more item to this list: any

———————

[2] JUSTICE BARRETT raises a host of additional questions regarding the "Supreme Court" parenthetical, *post*, at 4–5 (dissenting opinion), and she faults us for relying on this aspect of the provision without comprehensively "explain[ing] how it would work," *post*, at 5. But we see no need to explore every aspect or consequence of the parenthetical in order to answer the narrow question of our jurisdiction over this case. In declining to resolve these additional complexities, we merely heed JUSTICE BARRETT's admonition to "tread . . . carefully." *Post*, at 6.

action taken pursuant to sections 1221 through 1232.  Or it could have worded section 1252(f)(1) similarly to the immediately adjacent section 1252(g), which provides that "*no court shall have jurisdiction to hear any cause or claim* by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against [the alien]." (Emphasis added.)  But Congress did neither.  Instead, it constructed a carefully worded provision depriving the lower courts of power to "enjoin or restrain the operation of" certain sections of the statute, and it entitled that provision a "[l]imit on injunctive relief."

Our prior cases have already embraced this straightforward conclusion.  Most relevantly, the Court previously encountered a virtually identical situation in *Nielsen* v. *Preap*, 586 U. S. \_\_\_ (2019).  There, as here, the plaintiffs sought declaratory as well as injunctive relief in their complaint, and there, as here, the District Court awarded only the latter.  Yet this Court proceeded to reach the merits of the suit, notwithstanding the District Court's apparent violation of section 1252(f)(1), by reasoning that "[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' request for declaratory relief."  *Id.*, at \_\_\_–\_\_\_ (ALITO, J., joined by ROBERTS, C. J., and KAVANAUGH, J.) (slip op., at 8–9); see also *Jennings* v. *Rodriguez*, 583 U. S. \_\_\_, \_\_\_ (2018) (BREYER, J., joined by Ginsburg and SOTOMAYOR, JJ., dissenting) (slip op., at 31) (concluding that "a court could order declaratory relief" notwithstanding section 1252(f)(1)).  Our disposition in *Preap* is inconsistent with an interpretation of the limitation in section 1252(f)(1) that strips the lower courts of subject matter jurisdiction.[3]  And previous statements from this

---

[3] JUSTICE BARRETT notes that *Preap* involved consolidated cases, and that in one of the two cases the District Court granted declaratory as well

Court regarding section 1252(f)(1) are in accord. See *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 481 (1999) ("By its plain terms, and even by its title, [section 1252(f)(1)] is nothing more or less than a limit on injunctive relief.").

In short, we see no basis for the conclusion that section 1252(f)(1) concerns subject matter jurisdiction. It is true that section 1252(f)(1) uses the phrase "jurisdiction or authority," rather than simply the word "authority." But "[j]urisdiction . . . is a word of many, too many meanings." *Steel Co.*, 523 U. S., at 90. And the question whether a court has jurisdiction to grant a particular remedy is different from the question whether it has subject matter jurisdiction over a particular class of claims. See *Reed Elsevier, Inc.* v. *Muchnick*, 559 U. S. 154, 163–164 (2010) (concluding that "[t]he word 'jurisdiction' . . . says nothing about whether a federal court has subject-matter jurisdiction to adjudicate claims"). Section 1252(f)(1) no doubt deprives the lower courts of "jurisdiction" to grant classwide injunctive relief. See *Aleman Gonzalez*, 596 U. S., at ___ (slip op., at 11). But that limitation poses no obstacle to jurisdiction in this Court.[4]

## III

We now turn to the merits. Section 1225(b)(2)(C) provides: "In the case of an alien . . . who is arriving on land . . . from a foreign territory contiguous to the United States,

_____

as injunctive relief. *Post*, at 5, n. (dissenting opinion). That misses the point. The *Preap* District Court granted only injunctive relief, presenting the exact circumstances we confront here, yet this Court exercised jurisdiction over that lawsuit and resolved it on the merits.

[4] At our request, the parties briefed several additional questions regarding the operation of section 1252(f)(1), namely, whether its limitation on "jurisdiction or authority" is subject to forfeiture and whether that limitation extends to other specific remedies, such as declaratory relief and relief under section 706 of the APA. We express no view on those questions.

the [Secretary] may return the alien to that territory pending a proceeding under section 1229a." Section 1225(b)(2)(C) plainly confers a *discretionary* authority to return aliens to Mexico during the pendency of their immigration proceedings. This Court has "repeatedly observed" that "the word 'may' *clearly* connotes discretion." *Opati* v. *Republic of Sudan*, 590 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 10) (emphasis in original); see also, *e.g.*, *Weyerhaeuser Co.* v. *United States Fish and Wildlife Serv.*, 586 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 14); *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 346 (2005). The use of the word "may" in section 1225(b)(2)(C) thus makes clear that contiguous-territory return is a tool that the Secretary "has the authority, but not the duty," to use. *Lopez* v. *Davis*, 531 U. S. 230, 241 (2001).

Respondents and the Court of Appeals concede this point. Brief for Respondents 21 (contiguous-territory return is a "discretionary authority"); 20 F. 4th, at 996, n. 18 ("It's obviously true that §1225(b)(2)(C) is discretionary."). They base their interpretation instead on section 1225(b)(2)(A), which provides that, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." Respondents and the Court of Appeals thus urge an inference from the statutory structure: Because section 1225(b)(2)(A) makes detention mandatory, they argue, the otherwise-discretionary return authority in section 1225(b)(2)(C) becomes mandatory when the Secretary violates that detention mandate.

The problem is that the statute does not say anything like that. The statute says "may." And "may" does not just suggest discretion, it "*clearly* connotes" it. *Opati*, 590 U. S., at \_\_\_ (slip op., at 10) (emphasis in original); see also *Jama*, 543 U. S., at 346 ("That connotation is particularly apt where, as here, 'may' is used in contraposition to the word

'shall.'"). Congress's use of the word "may" is therefore inconsistent with respondents' proposed inference from the statutory structure. If Congress had intended section 1225(b)(2)(C) to operate as a mandatory cure of any noncompliance with the Government's detention obligations, it would not have conveyed that intention through an unspoken inference in conflict with the unambiguous, express term "may." It would surely instead have coupled that grant of discretion with some indication of its sometimes-mandatory nature—perhaps by providing that the Secretary "may return" certain aliens to Mexico, "unless the government fails to comply with its detention obligations, in which case the Secretary must return them." The statutory grant of discretion here contains no such caveat, and we will not rewrite it to include one. See *id.*, at 341 ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply.").

The principal dissent emphasizes that section 1225(b)(2)(A) requires detention of all aliens that fall within its terms. See, *e.g.*, *post*, at 8 (ALITO, J., dissenting) ("The language of 8 U. S. C. §1225(b)(2)(A) is unequivocal."). While the Government contests that proposition, we assume *arguendo* for purposes of this opinion that the dissent's interpretation of section 1225(b)(2)(A) is correct, and that the Government is currently violating its obligations under that provision.[5] Even so, the dissent's conclusions regarding section 1225(b)(2)(C) do not follow. Under the actual text of the statute, JUSTICE ALITO's interpretation is practically self-refuting. He emphasizes that "'[s]hall be

---

[5] For this reason, JUSTICE ALITO misunderstands our analysis in insisting that our opinion authorizes the Government to release aliens subject to detention under section 1225(b)(2)(A). See *post*, at 8 (dissenting opinion). We need not and do not decide whether the detention requirement in section 1225(b)(2)(A) is subject to principles of law enforcement discretion, as the Government argues, or whether the Government's current practices simply violate that provision.

detained' means 'shall be detained,'" *post*, at 9, and criticizes the Government's "argument that 'shall' means 'may,'" *post*, at 10. But the theory works both ways. Congress conferred contiguous-territory return authority in expressly discretionary terms. "'[M]ay return the alien' means 'may return the alien.'" The desire to redress the Government's purported violation of section 1225(b)(2)(A) does not justify transforming the nature of the authority conferred by section 1225(b)(2)(C).[6]

The historical context in which the provision was adopted confirms the plain import of its text. See, *e.g.*, *Niz-Chavez* v. *Garland*, 593 U. S. \_\_\_, \_\_\_ (2021) (slip op., at 9) (textual analysis confirmed by "a wider look at [the statute's] structure and history"). Section 1225(b)(2)(C) was not added to the statute until 1996, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), §302, 110 Stat. 300–583—more than 90 years after the Immigration Act of 1903 added the "shall be detained" language that appears in section 1225(b)(2)(A). And section 1225(b)(2)(C) was enacted in the immediate aftermath of a Board of Immigration Appeals (BIA) decision that specifically called into question the legality of the contiguous-territory return practice. Prior to that decision, the longstanding practice of the Immigration and Naturalization Service (INS) had been to require some aliens arriving at land border ports of

_____

[6] In arguing that the Court should do so, the dissent proposes a number of hypotheticals in which a party fails to comply with a legal obligation imposed by statute and additionally refuses to exercise a discretionary alternative authorized by that statute. *Post*, at 12–13 (ALITO, J., dissenting). We wholeheartedly endorse the conclusion that the dissent draws from these hypotheticals: that "the failure to make use of the discretionary option would not be seen as a valid excuse for non-compliance with the command that certain conduct 'shall' be performed." *Post*, at 13. But the question before us is not whether the Government is violating the immigration laws generally. The question is whether the INA requires the government to continue implementing MPP. And the statutory text clearly answers that question in the negative.

entry to await their exclusion proceedings in Canada or Mexico. The BIA noted the lack of "any evidence that this is a practice known to Congress" and "the absence of a supporting regulation." *In re Sanchez-Avila*, 21 I. & N. Dec. 444, 465 (1996) (en banc). Congress responded mere months later by adding section 1225(b)(2)(C) to IIRIRA and conferring on the Secretary express authority ("may") to engage in the very practice that the BIA had questioned. And INS acknowledged that clarification shortly thereafter, explaining that section 1225(b)(2)(C) and its implementing regulation "simply add[] to the statute and regulation a long-standing practice of the Service." 62 Fed. Reg. 445 (1997). That modest backstory suggests a more humble role for section 1225(b)(2)(C) than as a mandatory "safety valve" for any alien who is not detained under section 1225(b)(2)(A).

In addition to contradicting the statutory text and context, the novelty of respondents' interpretation bears mention. Since IIRIRA's enactment 26 years ago, every Presidential administration has interpreted section 1225(b)(2)(C) as purely discretionary. Indeed, at the time of IIRIRA's enactment and in the decades since, congressional funding has consistently fallen well short of the amount needed to detain all land-arriving inadmissible aliens at the border, yet no administration has ever used section 1225(b)(2)(C) to return all such aliens that it could not otherwise detain.

And the foreign affairs consequences of mandating the exercise of contiguous-territory return likewise confirm that the Court of Appeals erred. Article II of the Constitution authorizes the Executive to "engag[e] in direct diplomacy with foreign heads of state and their ministers." *Zivotofsky* v. *Kerry*, 576 U. S. 1, 14 (2015). Accordingly, the Court has taken care to avoid "the danger of unwarranted judicial interference in the conduct of foreign policy," and

declined to "run interference in [the] delicate field of international relations" without "the affirmative intention of the Congress clearly expressed." *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108, 115–116 (2013). That is no less true in the context of immigration law, where "[t]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy." *Arizona* v. *United States*, 567 U. S. 387, 397 (2012).

By interpreting section 1225(b)(2)(C) as a mandate, the Court of Appeals imposed a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico. MPP applies exclusively to non-Mexican nationals who have arrived at ports of entry that are located "in the United States." §1225(a)(1). The Executive therefore cannot unilaterally return these migrants to Mexico. In attempting to rescind MPP, the Secretary emphasized that "[e]fforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration." App. to Pet. for Cert. 262a. Yet under the Court of Appeals' interpretation, section 1225(b)(2)(C) authorized the District Court to force the Executive to the bargaining table with Mexico, over a policy that both countries wish to terminate, and to supervise its continuing negotiations with Mexico to ensure that they are conducted "in good faith." 554 F. Supp. 3d, at 857 (emphasis deleted). That stark consequence confirms our conclusion that Congress did not intend section 1225(b)(2)(C) to tie the hands of the Executive in this manner.

Finally, we note that—as DHS explained in its October 29 Memoranda—the INA expressly authorizes DHS to process applicants for admission under a third option: parole. See 8 U. S. C. §1182(d)(5)(A). Every administration, including the Trump and Biden administrations, has utilized this

authority to some extent. Importantly, the authority is not unbounded: DHS may exercise its discretion to parole applicants "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Ibid.* And under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained. See *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29 (1983). But the availability of the parole option additionally makes clear that the Court of Appeals erred in holding that the INA required the Government to continue implementing MPP.

In sum, the contiguous-territory return authority in section 1225(b)(2)(C) is discretionary—and remains discretionary notwithstanding any violation of section 1225(b)(2)(A). To reiterate: we need not and do not resolve the parties' arguments regarding whether section 1225(b)(2)(A) must be read in light of traditional principles of law enforcement discretion, and whether the Government is lawfully exercising its parole authorities pursuant to sections 1182(d)(5) and 1226(a). We merely hold that section 1225(b)(2)(C) means what it says: "may" means "may," and the INA itself does not require the Secretary to continue exercising his discretionary authority under these circumstances.

## IV

The Court of Appeals also erred in holding that "[t]he October 29 Memoranda did not constitute a new and separately reviewable 'final agency action.'" 20 F. 4th, at 951. To recap, the Secretary first attempted to terminate MPP through the June 1 Memorandum. As the Court of Appeals correctly held, that constituted final agency action. See *id.*, at 947 (citing *Bennett* v. *Spear*, 520 U. S. 154 (1997)). But the District Court found that the Secretary's stated grounds in the June 1 Memorandum were inadequate, and therefore "vacated" the June 1 Memorandum and "remanded [the

matter] to DHS for further consideration." 554 F. Supp. 3d, at 857.

As we explained two Terms ago in *Department of Homeland Security* v. *Regents of Univ. of Cal.*, 591 U. S. \_\_\_ (2020), upon finding that the grounds for agency action are inadequate, "a court may remand for the agency to do one of two things." *Id.*, at \_\_\_ (slip op., at 13). "First, the agency can offer 'a fuller explanation of the agency's reasoning at the time of the agency action.'" *Ibid.* (emphasis deleted). If it chooses this route, "the agency may elaborate" on its initial reasons for taking the action, "but may not provide new ones." *Id.*, at \_\_\_ (slip op., at 14). Alternatively, "the agency can 'deal with the problem afresh' by taking *new* agency action." *Ibid.* (quoting *SEC* v. *Chenery Corp.*, 332 U. S. 194, 201 (1947) (*Chenery II*)). "An agency taking this route is not limited to its prior reasons." *Regents*, 591 U. S., at \_\_\_ (slip op., at 14).

Here, perhaps in light of this Court's previous determination that the Government had "failed to show a likelihood of success on the claim that the [June 1 Memorandum] was not arbitrary and capricious," 594 U. S. \_\_\_, the Secretary selected the second option from *Regents*: He accepted the District Court's vacatur and dealt with the problem afresh. The October 29 Memoranda made that clear "by its own terms," *Regents*, 591 U. S., at \_\_\_ (slip op., at 14), in which the Secretary stated: "I am hereby terminating MPP. Effective immediately, I hereby supersede and rescind the June 1 memorandum." App. to Pet. for Cert. 263a–264a. And consistent with that approach, the October 29 Memoranda offered several "new reasons absent from" the June 1 Memorandum, *Regents*, 591 U. S., at \_\_\_ (slip op., at 14), including an examination of the "considerations that the District Court determined were insufficiently addressed in the June 1 memo," App. to Pet. for Cert. 259a.

The October 29 Memoranda were therefore final agency action for the same reasons that the June 1 Memorandum

was final agency action. That is, both the June 1 Memorandum and the October 29 Memoranda, when they were issued, "mark[ed] the 'consummation' of the agency's decisionmaking process" and resulted in "rights and obligations [being] determined." *Bennett*, 520 U. S., at 178. As the Court of Appeals explained, the June 1 Memorandum "bound DHS staff by forbidding them to continue the program in any way from that moment on." 20 F. 4th, at 947. That rationale also applies to the October 29 Memoranda, which were therefore final agency action under the APA.[7]

The various rationales offered by respondents and the Court of Appeals in support of the contrary conclusion lack merit.[8] First, the Court of Appeals framed the question by postulating the existence of an agency decision wholly apart from any "agency statement of general or particular applicability . . . designed to implement" that decision. 5

———————

[7] JUSTICE ALITO contends that the October 29 Memoranda were not final agency action because they did not obligate DHS employees to immediately cease implementing MPP; instead, they required them to do so "as soon as practicable after a final judicial decision to vacate" the District Court's injunction. App. to Pet. for Cert. 264a. But as he acknowledges, the standard for final agency action is whether the action "*result[ed] in a final determination* of 'rights or obligations.'" *Post,* at 17 (quoting *Bennett*, 520 U. S., at 178; emphasis added). The fact that the agency could not cease implementing MPP, as directed by the October 29 Memoranda, until it obtained vacatur of the District Court's injunction, did not make the October 29 Memoranda any less the agency's final determination of its employees' obligation to do so once such judicial authorization had been obtained.

[8] One rationale that we do not address at length is the Court of Appeals' extended analogy to the D. C. Circuit's "reopening doctrine." Respondents do not defend the Court of Appeals' reliance on that doctrine. In any event, this Court has never adopted it, and the doctrine appears to be inapposite to the question of final agency action. See *National Assn. of Reversionary Property Owners* v. *Surface Transp. Bd.*, 158 F. 3d 135, 141 (CADC 1998) (describing the doctrine as an "exception to statutory limits on the time for seeking review of an agency decision" (alterations omitted)).

U. S. C. §551(4); see 20 F. 4th, at 950–951 ("The States are challenging the *Termination Decision*—not the June 1 Memorandum, the October 29 Memoranda, or any other memo."). To the extent that the Court of Appeals understood itself to be reviewing an abstract decision apart from specific agency action, as defined in the APA, that was error. It was not the case that the June 1 Memorandum and the October 29 Memoranda "simply *explained* DHS's decision," while only the decision itself "had legal effect." *Id.*, at 951. To the contrary, the June 1 Memorandum and the October 29 Memoranda were themselves the operative agency actions, each of them an "agency statement . . . designed to implement, interpret, or prescribe law or policy." 5 U. S. C. §551(4).

Second, and relatedly, respondents characterized the October 29 Memoranda as *post hoc* rationalizations of the June 1 Memorandum under our decision in *Regents*. Brief for Respondents 40 ("[T]he [October 29] Memoranda are nothing more than improper, post hoc rationalizations for terminating MPP."); see also 20 F. 4th, at 961 (questioning how the October 29 Memoranda "[could] be anything more than *post hoc* rationalizations of the Termination Decision"). But *Regents* involved the exact opposite situation from this one. There, as here, DHS had attempted to rescind a prior administration's immigration policy, but a District Court found the rescission inadequately explained. Faced with the same two options outlined above, then-Secretary Nielsen elected the first option rather than the second. That is, she chose to "rest on the [original] Memorandum while elaborating on [her] prior reasoning," rather than "issue a new rescission bolstered by new reasons absent from the [original] Memorandum." 591 U. S., at \_\_\_ (slip op., at 14). As such, her elaboration "was limited to the agency's original reasons," and was "'viewed critically' to ensure that the rescission [was] not upheld on the basis of impermissible '*post hoc* rationalization.'" *Id.*, at \_\_\_–\_\_\_

(slip op., at 14–15). And because the then-Secretary's rea-
soning had "little relationship to that of her predecessor,"
the Court characterized the new explanations as "imper-
missible *post hoc* rationalizations . . . not properly before
us." *Id.*, at ___ (slip op., at 15).

The prohibition on *post hoc* rationalization applies only
when the agency proceeds by the first option from *Regents*.
Under that circumstance, because the agency has chosen to
"rest on [its original action] while elaborating on its prior
reasoning," *id.*, at ___ (slip op., at 14), the bar on *post hoc*
rationalization operates to ensure that the agency's supple-
mental explanation is anchored to "the grounds that the
agency invoked when it took the action," *Michigan* v. *EPA*,
576 U. S. 743, 758 (2015). By contrast, as noted above, the
Secretary here chose the second option from *Regents*, and
"'deal[t] with the problem afresh' by taking *new* agency ac-
tion." 591 U. S., at ___ (slip op., at 14). That second option
can be more procedurally onerous than the first—the
agency "must comply with the procedural requirements for
new agency action"—but the benefit is that the agency is
"not limited to its prior reasons" in justifying its decision.
*Ibid.* Indeed, the entire purpose of the October 29 Memo-
randa was for the Secretary to "issue a new rescission bol-
stered by new reasons absent from the [June 1] Memoran-
dum," *ibid.*—reasons that he hoped would answer the
District Court's concerns from the first go-round. Having
returned to the drawing table and taken new action, there-
fore, the Secretary was not subject to the charge of *post hoc*
rationalization.

Third, respondents invoke our decision in *Department of
Commerce* v. *New York*, 588 U. S. ___ (2019), to contend
that DHS's failure to "hew[] to the administrative straight
and narrow" deprives the October 29 Memoranda of the pre-
sumption of regularity that normally attends agency action,
Brief for Respondents 43. As we explained in that case, "in
reviewing agency action, a court is ordinarily limited to

evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Department of Commerce*, 588 U. S., at \_\_\_ (slip op., at 23). *Department of Commerce* involved a "narrow exception to th[at] general rule" that applies where the challengers to the agency's action make a "strong showing of bad faith or improper behavior" on the part of the agency. *Id.*, at \_\_\_ (slip op., at 24) (quoting *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 420 (1971)). We held that exception satisfied by an accumulation of "unusual circumstances" that demonstrated an "explanation for agency action that [was] incongruent with what the record reveal[ed] about the agency's priorities and decisionmaking process." *Department of Commerce*, 588 U. S., at \_\_\_ (slip op., at 28).

The circumstances in this case do not come close to those in *Department of Commerce*. Nothing in this record suggests a "significant mismatch between the decision the Secretary made and the rationale he provided." *Id.*, at \_\_\_ (slip op., at 26). Respondents direct us instead to the Government's litigation conduct. But the examples of misconduct to which respondents refer—such as a failure to timely complete the administrative record, Brief for Respondents 42— have no bearing on the legal status of the October 29 Memoranda. And in any event, they fall well short of the "strong showing of bad faith or improper behavior," *Overton Park*, 401 U. S., at 420, that we require before deviating from our normal rule that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based," *SEC* v. *Chenery Corp.*, 318 U. S. 80, 87 (1943).

The Court of Appeals leveled the related but more modest charge that the Secretary failed to proceed with a sufficiently open mind. See, *e.g.*, 20 F. 4th, at 955 (agency proceeded "without a hint of an intention to put the Termination Decision back on the chopping block and rethink

things"). But the agency's *ex ante* preference for terminating MPP—like any other feature of an administration's policy agenda—should not be held against the October 29 Memoranda. "It is hardly improper for an agency head to come into office with policy preferences and ideas . . . and work with staff attorneys to substantiate the legal basis for a preferred policy." *Department of Commerce*, 588 U. S., at ___ (slip op., at 26); see also *State Farm*, 463 U. S., at 59 (Rehnquist, J., concurring in part and dissenting in part) ("As long as [an] agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." (footnote omitted)).

And the critique is particularly weak on these facts. The Court of Appeals took the agency to task for its September 29 announcement of its "inten[tion] to issue in the coming weeks a new memorandum terminating" MPP. 20 F. 4th, at 954; see *ibid.* ("Rather than announcing an intention to *reconsider* its Termination Decision, the announcement set forth DHS's *conclusion* in unmistakable terms."). But that announcement came over six weeks after the District Court's August 13 remand—a substantial window of time for the agency to conduct a bona fide reconsideration.

More importantly, this Court has previously rejected criticisms of agency closemindedness based on an identity between proposed and final agency action. See *Little Sisters of the Poor Saints Peter and Paul Home* v. *Pennsylvania*, 591 U. S. ___, ___ (2020) (slip op., at 24) ("declin[ing] to evaluate the [agency's] final rules under [an] open-mindedness test" where interim and final rules were "virtually identical" but procedural requirements were otherwise satisfied). Similar principles refute the Court of Appeals' criticism of the October 29 Memoranda for their failure to "alter the Termination Decision in any way." 20 F. 4th, at 946. It is black-letter law that an agency that takes superseding ac-

tion on remand is entitled to "reexamine[] the problem, recast its rationale and reach[] the same result." *Chenery II*, 332 U. S., at 196; see also *Regents*, 591 U. S., at \_\_\_ (KAVANAUGH, J., concurring in judgment in part and dissenting in part) (slip op., at 4) ("Courts often consider an agency's . . . additional explanations made . . . on remand from a court, even if the agency's bottom-line decision itself does not change.").

Finally, the Court of Appeals erred to the extent it viewed the Government's decision to appeal the District Court's injunction as relevant to the question of the October 29 Memoranda's status as final agency action. Nothing prevents an agency from undertaking new agency action while simultaneously appealing an adverse judgment against its original action. That is particularly so under the circumstances of this case. The second condition of the District Court's injunction, which purported to bind DHS to implement MPP in perpetuity subject only to congressional funding choices outside its control, as a practical matter left the Government no choice but to appeal. And the agency reasonably chose to accede to the District Court's APA analysis of the June 1 Memorandum and seek to ameliorate those concerns in the meantime.

\*     \*     \*

For the reasons explained, the Government's rescission of MPP did not violate section 1225 of the INA, and the October 29 Memoranda did constitute final agency action. We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion. On remand, the District Court should consider in the first instance whether the October 29 Memoranda comply with section 706 of the APA. See *State Farm*, 463 U. S., at 46–57.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———

No. 21–954

———

## JOSEPH R. BIDEN, JR., PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS *v.* TEXAS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 30, 2022]

JUSTICE KAVANAUGH, concurring.

I agree with the Court that the District Court had jurisdiction over Texas's suit. I also agree with the Court that the Government prevails on the merits of the two specific legal questions presented here. I note, moreover, that six Members of the Court agree with the Court's merits conclusion. See *post*, at 1 (BARRETT, J., dissenting).

I write separately to briefly elaborate on my understanding of the relevant statutory provisions and to point out one legal issue that remains open for resolution on remand.

When the Department of Homeland Security lacks sufficient capacity to detain noncitizens at the southern border pending their immigration proceedings (often asylum proceedings), the immigration laws afford DHS two primary options.

Option one: DHS may grant noncitizens parole into the United States if parole provides a "significant public benefit." 8 U. S. C. §1182(d)(5)(A). Parole entails releasing individuals on a case-by-case basis into the United States subject to "reasonable assurances" that they "will appear at all hearings." 8 CFR §212.5(d) (2020); see 8 U. S. C. §1182(d)(5)(A). Notably, every Administration beginning in the late 1990s has relied heavily on the parole option, including the administrations of Presidents Clinton, Bush, Obama, Trump, and Biden. See Tr. of Oral Arg. 4, 49–54.

Option two:  DHS may choose to return noncitizens to Mexico.  8 U. S. C. §1225(b)(2)(C).  Consistent with that statutory authority, the prior Administration chose to return a relatively small group of noncitizens to Mexico.

In general, when there is insufficient detention capacity, both the parole option and the return-to-Mexico option are legally permissible options under the immigration statutes. As the recent history illustrates, every President since the late 1990s has employed the parole option, and President Trump also employed the return-to-Mexico option for a relatively small group of noncitizens.  Because the immigration statutes afford substantial discretion to the Executive, different Presidents may exercise that discretion differently.  That is Administrative Law 101.  See *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part).

To be sure, the Administrative Procedure Act and this Court's decision in *State Farm* require that an executive agency's exercise of discretion be reasonable and reasonably explained.  See *id.*, at 43 (majority opinion); see also *FCC* v. *Prometheus Radio Project*, 592 U. S. ___, ___–___, ___ (2021) (slip op., at 7−8, 11); *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 514−515 (2009); 5 U. S. C. §706. For example, when there is insufficient detention capacity and DHS chooses to parole noncitizens into the United States rather than returning them to Mexico, DHS must reasonably explain why parole provides a "significant public benefit."  8 U. S. C. §1182(d)(5)(A); see, *e.g., State Farm*, 463 U. S., at 46–57.  Review under that *State Farm* standard is deferential but not toothless.  *Id.,* at 56.

The question of whether DHS's October 29 decision satisfies the *State Farm* standard is not before this Court at this time.  The Court today therefore properly leaves the *State Farm* issue for consideration on remand.  See *ante*, at 18, 25; Tr. of Oral Arg. 67−68.

To be clear, when there is insufficient detention capacity and the President chooses the parole option because he determines that returning noncitizens to Mexico is not feasible for foreign-policy reasons, a court applying *State Farm* must be deferential to the President's Article II foreign-policy judgment. Cf., *e.g.*, *Trump* v. *Hawaii*, 585 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (slip op., at 10–15). Nothing in the relevant immigration statutes at issue here suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment with respect to American foreign policy and foreign relations. See *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635−637 (1952) (Jackson, J., concurring); see also *Dames & Moore* v. *Regan*, 453 U. S. 654, 678–679, 686–688 (1981).

One final note: The larger policy story behind this case is the multi-decade inability of the political branches to provide DHS with sufficient facilities to detain noncitizens who seek to enter the United States pending their immigration proceedings. But this Court has authority to address only the legal issues before us. We do not have authority to end the legislative stalemate or to resolve the underlying policy problems.

With those additional comments, I join the Court's opinion in full.

# SUPREME COURT OF THE UNITED STATES

---

No. 21–954

---

## JOSEPH R. BIDEN, JR., PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS *v.* TEXAS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 30, 2022]

JUSTICE ALITO, with whom JUSTICE THOMAS and JUSTICE GORSUCH join, dissenting.

In fiscal year 2021, the Border Patrol reported more than 1.7 million encounters with aliens along the Mexican border.[1] When it appears that one of these aliens is not admissible, may the Government simply release the alien in this country and hope that the alien will show up for the hearing at which his or her entitlement to remain will be decided?

Congress has provided a clear answer to that question, and the answer is no. By law, if an alien is "not clearly and beyond a doubt entitled to be admitted," the alien "*shall* be detained for a [removal] proceeding." 8 U. S. C. §1225(b)(2)(A) (emphasis added). And if an alien asserts a credible fear of persecution, he or she "*shall* be detained for further consideration of the application for asylum," §1225(b)(1)(B)(ii) (emphasis added). Those requirements, as we have held, are mandatory. See *Jennings* v. *Rodriguez*, 583 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 13).

Congress offered the Executive two—and only two—alternatives to detention. First, if an alien is "arriving on land" from "a foreign territory contiguous to the United

---

[1] U. S. Customs and Border Protection, Southwest Land Border Encounters, FY Southwest Land Border Encounters by Month (chart) (May 3, 2022), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (showing 1,734,686 total encounters in fiscal year 2021).

States," the Department of Homeland Security (DHS) "may return the alien to that territory pending a [removal] proceeding." §1225(b)(2)(C). Second, DHS may release individual aliens on "parole," but "only on a case-by-case basis for urgent humanitarian reasons or a significant public benefit." §1182(d)(5)(A).

Due to the huge numbers of aliens who attempt to enter illegally from Mexico, DHS does not have the capacity to detain all inadmissible aliens encountered at the border, and no one suggests that DHS must do the impossible. But rather than avail itself of Congress's clear statutory alternative to return inadmissible aliens to Mexico while they await proceedings in this country, DHS has concluded that it may forgo that option altogether and instead simply release into this country untold numbers of aliens who are very likely to be removed if they show up for their removal hearings. This practice violates the clear terms of the law, but the Court looks the other way.

In doing so, the majority commits three main errors. First, it unnecessarily resolves difficult jurisdictional questions on which—due to the Government's litigation tactics—we have received only hurried briefing and no argument. Second, when the majority reaches the merits, it contrives a way to overlook the clear statutory violations that result from DHS's decision to terminate the use of its contiguous-territory return authority. Finally, the majority unjustifiably faults the Court of Appeals for rejecting the Government's last-minute attempt to derail the ordinary appellate process. I cannot go along with any of this, and I therefore respectfully dissent.

## I

In 2018, a surge of foreign migrants attempted to enter the United States unlawfully at the United States-Mexico border, creating a "'humanitarian and border security crisis.'" 554 F. Supp. 3d 818, 831 (ND Tex. 2021). Because

existing detention facilities could not house all the people who were attempting to enter unlawfully, many "illegal aliens with meritless asylum claims were being released into the United States," and many, once released, simply "'disappeared.'" *Ibid.* (emphasis deleted). To address this problem, DHS promulgated the Migrant Protection Protocols (MPP) in December of that year. See *id.*, at 832. The MPP program relied on Congress's express grant of authority to "return" "alien[s] . . . arriving on land . . . from a foreign territory contiguous to the United States" "to that territory pending a proceeding" to remove them to their countries of origin. §1225(b)(2)(C).[2] MPP provided that certain non-Mexican nationals arriving at the United States border by land from Mexico would be returned to Mexico to await the results of their removal proceedings. The Mexican Government agreed to cooperate and to accept aliens while they awaited removal.

While the policy was in effect, DHS issued a memorandum in which it determined that MPP was "an indispensable tool in addressing the ongoing crisis at the southern border." App. 189 (Department of Homeland Security: Assessment of the Migrant Protection Protocols (Oct. 28, 2019)). It concluded that MPP directly reduced the number of aliens unlawfully released into the United States and deterred others from attempting to cross the border unlawfully in the first place. 554 F. Supp. 3d, at 833. DHS found that total border encounters decreased by 64 percent after MPP was implemented. App. 189. With MPP in place, aliens who lacked meritorious claims could no longer count on "a free ticket into the United States," and as a result, many "voluntarily return[ed] home." *Id.*, at 192. MPP also helped DHS process meritorious asylum claims "within

──────────

[2] That policy was almost immediately enjoined by a Federal District Court. *Innovation Law Lab* v. *Nielsen*, 366 F. Supp. 3d 1110 (ND Cal. 2019). This Court stayed that injunction. *Wolf* v. *Innovation Law Lab*, 589 U. S. \_\_\_ (2020).

months," rather than leaving asylum applicants "in limbo for years." *Id.*, at 190.

Hours after his inauguration on January 20, 2021, President Biden issued an Executive Order suspending MPP, and the effects on the border were immediate. According to the Government's own data, border "encounters jump[ed] from 75,000 in January 2021," when MPP was first suspended, to about "173,000 in April 2021." 554 F. Supp. 3d, at 837.

Two States, Texas and Missouri, brought suit under the Administrative Procedure Act (APA) in April 2021, alleging that suspending MPP was arbitrary and capricious and violated the Immigration and Nationality Act (INA). The District Court ordered the Government to file the administrative record for the January suspension, and on May 31, 2021, the Government filed a three-line suspension memorandum as the entire administrative record. See *id.,* at 856, n. 16. The next day, in a 7-page memo issued by the Secretary, DHS terminated the already-suspended program.

The States amended their complaint to challenge the June termination decision on largely the same grounds that they had advanced with respect to the January suspension. After a consolidated preliminary injunction hearing and a trial on the merits under Federal Rule of Civil Procedure 65(a)(2), the District Court vacated the Government's decision to rescind MPP and enjoined the Secretary to continue to implement that policy "in good faith" until all the aliens in question could be detained or lawfully paroled. *Id.*, at 857. The Government sought a stay of this order, but the United States Court of Appeals for the Fifth Circuit, while expediting the Government's appeal, refused to issue a stay. 10 F. 4th 538, 543–561 (2021) (*per curiam*). The Government then sought a stay in this Court, but we denied that application. 594 U. S. ___ (2021).

On September 29, 2021, while briefing in the Court of Appeals was underway, DHS announced that it intended to

issue a new memorandum terminating MPP, and the Government asked the Court of Appeals to hold its appeal in abeyance pending this promised administrative action. App. 51–52. The Court of Appeals denied that motion, *id.*, at 54, and then, two business days before oral argument, DHS issued two memoranda declaring that DHS had made a new decision terminating MPP. See App. to Pet. for Cert. 257a–345a. At the same time, the Government asked the Court of Appeals to hold that the case before it was moot, to vacate the District Court's judgment and injunction, and to remand the case for further proceedings. 20 F. 4th 928, 946 (CA5 2021). The Fifth Circuit refused and held that the October 29 Memoranda did not moot the appeal or have any other legal effect on the appellate proceedings. *Id.*, at 956–966, 998–1000. The Fifth Circuit then affirmed the District Court on the merits.

## II

I agree with the majority that the injunction entered by the District Court in this case exceeded its "jurisdiction or authority to enjoin or restrain the operation of" the relevant statutes. §1252(f)(1). That conclusion follows from a straightforward analysis of the text of §1252(f)(1), as recognized by the Court's decision in *Garland* v. *Aleman Gonzalez*, 596 U. S. \_\_\_ (2022). But that is where the majority and I part ways.

I agree with JUSTICE BARRETT that the majority should not go any further and should not resolve other questions about §1252(f)(1) without adequate briefing or argument. The Government admits that "this Court could in theory vacate the judgment below without reaching the merits," Supp. Brief for Petitioners 23, but the majority chooses to decide far more than is necessary or advisable under the circumstances.

As JUSTICE BARRETT explains, the interpretation of §1252(f)(1) presents difficult questions that the parties

should have addressed in the briefs they filed before oral argument.  In its opening brief, the Government's only discussion of this issue appeared in a footnote that reads as follows in its entirety:

> "In addition, the lower courts lacked jurisdiction to grant injunctive relief under 8 U. S. C. [§]1252(f)(1).  This Court is considering the scope of Section 1252(f)(1) in *Garland* v. *Aleman Gonzalez*, No. 20–322 (argued Jan. 11, 2022)."  Brief for Petitioners 18, n. 3.

That footnote's reference to the Government's brief in *Gonzalez* raised an obvious question.  Section 1252(f)(1) refers to orders that "enjoin or restrain the operation of" specified statutory provisions, and in *Gonzalez*, the Government suggested that this provision should not be interpreted to apply only to injunctions.  Brief for Petitioners 17–19, 32, n. 3, and Tr. of Oral Arg. 15–16, in *Garland* v. *Aleman Gonzalez*, O. T. 2021, No. 20–322.  Instead, the Government refused to rule out the possibility that the provision might also apply to class-wide declaratory relief, and it analogized §1252(f)(1) to the Tax Injunction Act, 28 U. S. C. §1341, and cited our decision in *California* v. *Grace Brethren Church*, 457 U. S. 393 (1982), which interpreted that provision in a "'practical sense.'"  *Id.*, at 408.

In the present case, the Government challenged the order of the District Court "set[ting] aside" under the APA, 5 U. S. C. §706(2), the June termination of MPP, and since this order had a practical effect that was in some respects similar to an injunction, the Government's argument in *Gonzalez* raised the question whether the Government thought that §1252(f)(1) also barred the District Court from reviewing the termination of the MPP under the APA.  That is an important question the resolution of which could have effects extending far beyond this particular dispute, and at oral argument the Solicitor General took the far-reaching position that §1252(f)(1) does indeed bar APA review.  See

Tr. of Oral Arg. 13–14. But none of the papers filed by the Government in this case or in *Gonzalez* said one word about APA review. Nor did the respondents' brief. Indeed, their brief did not discuss jurisdiction at all.

Faced with this situation, the Court was correctly concerned about deciding the reach of §1252(f)(1) and the important APA question without any briefing. The Court could have—and, in my judgment, should have—dealt with this problem by deciding this case without saying anything about §1252(f)(1) other than that it bars injunctive relief. Instead, with the end of the Term looming ahead, the Court directed the parties to brief these issues, but it gave them just one week to do so. And as the Court should have anticipated, those briefs raised new questions that it would have been useful to explore at argument had that been held. But determined to accommodate the Government's request that this case be decided this Term, the majority inadvisably plows ahead.

I would not do so. Because of the Government's request for a speedy decision, we established an expedited schedule for the filing of merits briefs and squeezed in oral argument on the next-to-last argument date. We would have been in a position to give thorough consideration to the §1252(f)(1) issue if it had been addressed in the parties' regular briefs, but having relegated the issue to a terse footnote in its brief, and having been unprepared to discuss the issue at argument, the Government is not entitled to any further special treatment. We should simply vacate the decision below and remand for reconsideration in light of our decision in *Gonzalez*.[3] Nothing more is either necessary or appropriate under the circumstances.

## III

The Court is not only wrong to reach the merits of this

—————
[3] Alternatively, the Court could have put the case over to next Term, received full briefing, and heard argument in October.

case, but its analysis of the merits is seriously flawed. First, the majority errs in holding that the INA does not really mean what it says when it commands that the aliens in question "shall" be detained pending removal or asylum proceedings unless they are either returned to Mexico or paroled on a case-by-case basis. According to the majority, it is fine for DHS simply to release these aliens en masse and allow them to disappear. Second, the majority improperly faults the Court of Appeals for refusing to allow the Government to derail the appellate process by a last-minute maneuver designed to thwart review of the manner in which it initially terminated MPP.

### A

As described above, the INA gives DHS three options regarding the treatment of the aliens in question while they await removal or asylum proceedings. They may be (1) detained in this country or (2) returned to Mexico or (3) paroled on a case-by-case basis. Congress has provided no fourth option, but the majority now creates one. According to the majority, an alien who cannot be detained due to a shortage of detention facilities but could be returned to Mexico may simply be released. That is wrong.

### 1

The language of 8 U. S. C. §1225(b)(2)(A) is unequivocal. With narrow exceptions that are inapplicable here,[4] it provides that every alien "who is an applicant for admission" and who "the examining immigration officer determines . . . is not clearly and beyond a doubt entitled to be admitted . . .

---

[4] Entitled "Exception," §1225(b)(2)(B) provides:

"Subparagraph (A) shall not apply to an alien—

"(i) who is a crewman,

"(ii) to whom paragraph (1) applies, or

"(iii) who is a stowaway."

If anything, the narrowness of the enumerated exceptions demonstrates the force of the rule: Detention for all others is mandatory.

*shall be detained* for a [removal] proceeding." (Emphasis added.) Six years ago, the Government argued strenuously that this requirement is mandatory, and its brief could hardly have been more categorical or emphatic in making this point. See Brief for Petitioners in *Jennings* v. *Rodriguez,* O. T. 2017, No. 15–1204, p. 15 ("Aliens seeking admission who are not 'clearly and beyond a doubt entitled to be admitted' are statutorily prohibited from physically entering the United States and must be detained during removal proceedings . . . , unless the Secretary exercises his discretion to release them on parole"); *id.*, at 17 ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement. And here, the repeated 'shall be detained' clearly means what it says" (internal quotation marks and citations omitted)).

The *Jennings* Court correctly accepted that argument, which was central to our holding. See 583 U. S., at \_\_\_ (slip op., at 13) ("Read most naturally, §§1225(b)(1) and (b)(2) thus mandate detention of applicants for admission until certain proceedings have concluded"). But now, in an about-face, the Government argues that "shall be detained" actually means "may be detained." See Brief for Petitioners 29 ("[T]he Court will not construe a provision stating that law enforcement 'shall' take some action as a 'true mandate' absent 'some stronger indication from the . . . Legislature'").

The Government was correct in *Jennings* and is wrong here. "[S]hall be detained" means "shall be detained." The Government points out that it lacks the facilities to detain all the aliens in question, and no one questions that fact. But use of the contiguous-return authority would at least reduce the number of aliens who are released in violation of the INA's command. The District Court made a factual finding that rescinding MPP would cause additional violations of Congress's unambiguous detention mandate. 554 F. Supp. 3d, at 851–852. It also found that "the termination

of MPP has contributed to the current border surge" by giv-ing aliens the "perverse incentiv[e]," *id.,* at 837, App. 196, to cross the border illegally in hopes of being paroled and released. *Id.,* at 79. Thus, the Government is failing to meet the statutory detention mandate, not only because of limitations on its detention capacity but also because it re-fuses to use the contiguous-territory return authority.

Other than the argument that "shall" means "may," the Government's only other textual argument is that it is pa-roling aliens "on a case-by-case basis for urgent humanitar-ian reasons or significant public benefit," as permitted un-der §1182(d)(5)(A). But the number of aliens paroled each month under that provision—more than 27,000 in April of this year[5]—gives rise to a strong inference that the Govern-ment is not really making these decisions on a case-by-case basis. The Government argues that respondents had the burden to show that it is not making case-by-case determi-nations and that they have not met that burden, see Brief for Petitioners 34, but information about the true nature of these proceedings is in the Government's possession, and it has revealed little about what actually takes place. At ar-gument, however, the Solicitor General argued that the case-by-case determination requirement can be met simply by going through a brief checklist for each alien. See Tr. of Oral Arg. 58–60. Even the rudimentary step of verifying that an alien does not have a criminal record is not per-formed in every case. *Id.*, at 31. Such procedures are in-

——————

[5] See, *e.g.,* Defendants' Monthly Report for April 2022 in No. 2:21–cv–67, ECF Doc. 139, p. 4 (ND Tex., May 16, 2022) ("For the month of April 2022, DHS reported that the total number of applicants for admission under Section 1225 paroled into the United States was 91,250. This fig-ure combines 88,452 [Customs and Border Patrol] grants of parole . . . and 27,654 individuals '. . . Paroled into the U. S. on a case-by-case basis pursuant to 8 U. S. C. §1182(d)(5)'"); see also Defendants' Monthly Re-port for March 2022, ECF Doc. 136, p. 3.

consistent with the ordinary meaning of "case-by-case" review, and as the Court of Appeals pointed out, the circumstances under which §1182(d)(5)(B)) was adopted bolster that conclusion. See 20 F. 4th, at 947 (After "the executive branch on multiple occasions purported to use the parole power to bring in large groups of immigrants," "Congress twice amended 8 U. S. C. §1182(d)(5) to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool" (citing T. Aleinikoff et al., Immigration and Citizenship: Process and Policy 300 (9th ed. 2021))).

The majority claims that the Government's use of its parole authority under §1182(d)(5)(A) is not before us, *ante,* at 18, but the Government cites that authority as a reason why it does not need to use its contiguous-territory return authority. Brief for Petitioners 6, 33–36. Moreover, the District Court's judgment relied on factual findings regarding DHS's abuse of its parole authority on the record that the Government provided. 554 F. Supp. 3d, at 837.

For these reasons, §1182(d)(5)(A) cannot justify the release of tens of thousands of apparently inadmissible aliens each month, and that leaves the Government with only one lawful option: continue to return inadmissible aliens to Mexico. See §1225(b)(2)(C).

2

The majority's chief defense of the Government's rejection of MPP is based on a blinkered method of statutory interpretation that we have firmly rejected. The majority largely ignores the mandatory detention requirement imposed by §1225(b)(2)(A) and, instead, reads the contiguous-return provision, §1225(b)(2)(C), in isolation. That provision says that the Secretary "may" return aliens to the country from which they entered, not that the Secretary must do so, and for the majority, that is enough to show that use of that authority is not required.

That reading ignores "the statutory structure" of the INA, *ante*, at 14, and wrongly "confine[s] itself to examining a particular statutory provision in isolation." *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 132 (2000). We have an obligation to read the INA as a "coherent regulatory scheme." *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 569 (1995); see also *FTC* v. *Mandel Brothers, Inc.*, 359 U. S. 385, 389 (1959); *Epic Systems Corp.* v. *Lewis*, 584 U. S. ___, ___ (2018) (slip op., at 10); A. Scalia & G. Garner, Reading Law 180 (2012) (describing the "harmonious-reading canon"). And if we follow that canon, the majority's interpretation collapses.

Read as a whole, the INA gives DHS discretion to choose from among only three options for handling the relevant category of inadmissible aliens. The Government must either: (1) detain them, (2) return them to a contiguous foreign nation, or (3) parole them into the United States on an individualized, case-by-case basis. These options operate in a hydraulic relationship: When it is not possible for the Government to comply with the statutory mandate to detain inadmissible aliens pending further proceedings, it must resort to one or both of the other two options in order to comply with the detention requirement to the greatest extent possible.

There is nothing strange about this interpretation of how the relevant provisions of the INA work together. Consider this example. Suppose a state law provides that every school district "shall" provide a free public education to every student from kindergarten through the 12th grade and that another statute says that a district "may" arrange for its students to attend high school in an adjacent district. A small district refuses to operate its own high school because it lacks the necessary funds, and this district also declines to arrange for its students to attend a school in an adjacent district because the law says only that a district "may" take that course of action. Refusing to exercise this

discretionary authority, the district throws up its hands and says to its high school students: "We're sorry. If you want to go to high school, you will have to make your own arrangements and foot the bill." If those students sue, would any court sustain what the district did?

Other examples come readily to mind. Suppose that a building code says that every multi-unit residential building "shall" have at least two means of egress from upper floors, and suppose that another provision says that such a building "may" have an external fire escape. The owner of such a building refuses to construct a second internal stairway because the cost would be prohibitive and also declines to install a fire escape because the law says that option is discretionary. Would the owner's non-compliance be permitted?

Here is one more example. A State that operates its own motor vehicle inspection facilities has a law that says that every vehicle "shall" be inspected every year. The law also says that motorists "may" have their vehicles inspected at a licensed private garage. A motorist fails to have his car inspected because he must work during the time when the state facility is open and would be fired if he took time off. This motorist also declines to have his car inspected at a private garage that is open during his off hours because the law says only that he "may" use such a facility. Would the motorist escape a citation?

The answer in each of the above examples is that the failure to make use of the discretionary option would not be seen as a valid excuse for non-compliance with the command that certain conduct "shall" be performed, and it is also hard to see the difference between those examples and the situation here.

3

The majority's main reason for rejecting the argument just described is that the contiguous-return provision does

not say expressly that it was meant to "operate as a mandatory cure of any non-compliance with the Government's detention obligations." *Ante*, at 14. But what logic compels need not be stated expressly.

The majority also relies on the fact that the contiguous-return provision was enacted 90 years after the provision requiring detention and the fact that the circumstances under which the contiguous-return provision was adopted suggest that it was intended to serve only a "humble role." *Ante*, at 16. Those circumstances cannot change what the relevant provisions say or the way in which they logically work together. See *Exxon Mobil Corp.* v. *Allapattah Services, Inc.*, 545 U. S. 546, 568 (2005) ("Extrinsic materials have a role in statutory interpretation only to the extent that they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms"). The Court should not use extra-textual evidence to demote one of DHS's three lawful alternatives to the status of a historical footnote.

The majority and the concurrence fault the lower courts for intruding upon the foreign policy authority conferred on the President by Article II of the Constitution. *Ante*, at 16–17 (majority opinion); *ante*, at 3 (opinion of KAVANAUGH, J.). But enforcement of immigration laws often has foreign relations implications, and the Constitution gives Congress broad authority to set immigration policy. See Art. I, §8, cl. 4. This means, we have said, that "[p]olicies pertaining to the entry of aliens" are "entrusted *exclusively* to Congress." *Galvan* v. *Press*, 347 U. S. 522, 531 (1954) (emphasis added). The President has vital power in the field of foreign affairs, so does Congress, and the President does not have the authority to override immigration laws enacted by Congress. Indeed, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional

powers of Congress over the matter." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 637 (1952) (Jackson, J., concurring). And it is Congress, not the Judiciary, that gave the Executive only three options for dealing with inadmissible aliens encountered at the border.

Finally, the majority emphasizes the fact that prior administrations have also failed to detain inadmissible aliens, but that practice does not change what the law demands. The majority cites no authority for the doctrine that the Executive can acquire authority forbidden by law through a process akin to adverse possession.

### B

Not only does the majority fail to heed the clear language of the INA, but it gratuitously faults the Court of Appeals for what appears to be a fairly modest and correct conclusion: that the October 29 Memoranda purporting to re-terminate MPP did not ultimately affect the merits of the appeal of the judgment that was before that court. The Government issued its October 29 Memoranda after briefing in the Court of Appeals had been completed and only days before the appeal was set to be argued. Based on those memoranda, the Government asked the Court of Appeals to vacate the judgment below, but it did not provide a full administrative record or give the District Court an opportunity to review the purported new decision in the first instance by filing a Rule 60(b) motion.[6] The majority now says that the Court of Appeals erred by failing to treat the October 29 Memoranda as a new, final agency action, but the majority does not say what applying that label would have required the Fifth Circuit to do differently.

As I see it, the Government's litigation tactic—filing the October 29 Memoranda with a suggestion of mootness but without seeking to dismiss its appeal—could have triggered

─────────

[6] See generally 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2961 (3d ed. 2013).

one of four responses from the Court of Appeals. The Court of Appeals could have (1) dismissed the appeal as moot and vacated the District Court's judgment and injunction; (2) held the appeal in abeyance for an unspecified time; (3) evaluated the October 29 Memoranda as final agency action in the first instance under the APA; or (4) concluded that the October 29 Memoranda did not affect the appeal, which challenged the June termination. The Court of Appeals picked the fourth option, and taking each option in turn, I will explain why that was the response best suited to avoid derailing the ordinary appellate process.

First, the October 29 Memoranda did not moot the appeal. A case becomes moot only if it is impossible for the court to "'grant any effectual relief.'" *Chafin* v. *Chafin*, 568 U. S. 165, 172 (2013). Under this high standard, the Fifth Circuit was correct that the case was not moot. Although the Government claimed that the appeal was moot, it asked the Court of Appeals for relief, namely, vacatur of District Court's injunction. It was compelled to take that position because the October 29 Memoranda, by their own terms, did not take effect as long as that injunction remained in force. See 20 F. 4th, at 957. And without an appellate decision holding that the INA allows the Government to release aliens who could be returned to Mexico, the issuance of a new administrative order terminating MPP could not provide a ground for vacating the injunction. It is telling that the Government's briefing in this Court never suggests that the case was moot at the time of the Fifth Circuit's decision or that the case is now moot.

Second, the Court of Appeals did not err by declining to hold the appeal in abeyance. The Government originally asked the Court of Appeals to hold the appeal while it completed the process of issuing a new termination decision, but by the time of oral argument in that court, the Government claimed that such a decision had been issued. And the Government did not file a motion in the District Court

to vacate its judgment under Federal Rule of Civil Procedure 60(b). The Government had sought to expedite proceedings at every stage, including by seeking emergency relief in the Fifth Circuit and this Court, and under these circumstances, it was eminently reasonable for the Court of Appeals to conclude that additional delay would not have served the interests of "economy of time and effort." *Landis* v. *North American Co.*, 299 U. S. 248, 254 (1936).

Third, the Court of Appeals correctly concluded that the October 29 Memoranda could not satisfy our criteria for a final agency action that could be reviewed in the first instance in the Court of Appeals under the APA. Like this Court, the courts of appeal are courts of "'review, and not first view.'" *City of Austin* v. *Reagan Nat. Advertising of Austin, LLC*, 596 U. S. \_\_\_, \_\_\_–\_\_\_ (2022) (slip op., at 13–14) (quoting *Zivotofsky* v. *Clinton*, 566 U. S. 189, 201 (2012)). With no administrative record for the October 29 Memoranda before it, the Court of Appeals was in a poor position to assess whether the memoranda actually "mark[ed] the consummation of the agency's decisionmaking process," *Bennett* v. *Spear*, 520 U. S. 154, 178 (1997) (internal quotation marks omitted). Moreover, the October 29 Memoranda did not purport to result in a final determination of "'rights or obligations.'" *Ibid.* As DHS acknowledged, "the termination of MPP" could not "be implemented" until there was "a final judicial decision to vacate the . . . injunction." App. to Pet. for Cert. 264a, 270a. And until that was accomplished, the memoranda did not impose on DHS officers or employees any "'obligatio[n]'" to cease implementation of MPP. *Bennett*, 520 U. S., at 178. On this basis, the Fifth Circuit rightly understood that the October 29 Memoranda could have no legal effect while DHS was bound by an injunction to implement MPP in good faith and that this injunction would remain in force unless the Government's challenge to the June termination was

decided in its favor.[7]

Even if the Fifth Circuit had somehow concluded that the October 29 Memoranda constituted final agency action with some future legal consequences, the Court does not explain what the Fifth Circuit should have done differently in the circumstances it faced. The Fifth Circuit had little ability to review whether the agency had acted reasonably. See *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29 (1983). And the Fifth Circuit provided a reasonable explanation for its actions.

With these three options off the table, the Fifth Circuit reasonably chose the fourth option. It correctly concluded that the October 29 Memoranda did not affect its ability to review the District Court judgment. To find fault with proceeding in that fashion, the majority seems to assume that an administrative agency may obviate a district court decision setting aside agency action under §706 of the APA by pursing the following course of conduct: first, appeal the

———————

[7] The majority concludes that the October 29 Memoranda had legal consequences because they represented DHS's "final determination of its employees' obligation" to terminate MPP, even if that "'determination'" could not generate any obligations until the agency "obtained vacatur of the District Court's injunction." *Ante*, at 20, n. 7 (emphasis deleted). This expansive, formalist approach to the second *Bennett* factor is at odds with the usual "'pragmatic' approach we have long taken to finality." *Army Corps of Engineers* v. *Hawkes Co.,* 578 U. S. 590, 599 (2016) (quoting *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 149 (1967)). "To determine when an agency action is final, we have looked to, among other things, whether its impact 'is sufficiently direct and immediate' and has a 'direct effect on . . . day-to-day business.'" *Franklin* v. *Massachusetts*, 505 U. S. 788, 796–797 (1992) (quoting *Abbott Laboratories*, 387 U. S., at 152). By their own terms, as the majority acknowledges, the October 29 Memoranda had no direct or immediate effect on the day-to-day business of DHS employees. To conclude that such future agency intentions may nevertheless meet the formal definition of final agency action may result in many agencies facing judicial scrutiny over interim rules, guidance documents, letters, and informal opinions that may not bind anyone now or even later.

district court decision; second, take a purportedly "new" action that achieves the same result as the one previously set aside; and third, while declining to seek vacatur of the earlier judgment in the district court, ask the court of appeals to vacate that judgment without reviewing its correctness or the lawfulness of the second action. The Court of Appeals was correct to view this as an effort to thwart the normal appellate process.

\*   \*   \*

While I would affirm the Fifth Circuit if we reached the merits, I agree with the majority that the District Court on remand should consider in the first instance whether the October 29 Memoranda complied with §706 of the APA. The District Court should assess, among other things, whether it is "arbitrary and capricious" for DHS to refuse to use its contiguous-territory return authority to avoid violations of the statute's clear detention mandate; whether the deterrent effect that DHS found MPP produced in reducing dangerous attempted illegal border crossings, as well as MPP's reduction of unmeritorious asylum claims, is adequately accounted for in the agency's new decision; and whether DHS's rescission of MPP is causing it to make parole decisions on an unlawful categorical basis rather than case-by-case, as the statute prescribes.

# SUPREME COURT OF THE UNITED STATES

———————

No. 21–954

———————

## JOSEPH R. BIDEN, JR., PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS *v.* TEXAS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 30, 2022]

JUSTICE BARRETT, with whom JUSTICE THOMAS, JUSTICE ALITO, and JUSTICE GORSUCH join as to all but the first sentence, dissenting.

I agree with the Court's analysis of the merits—but not with its decision to reach them. The lower courts in this case concluded that 8 U. S. C. §1252(f)(1), a provision of the Immigration and Nationality Act sharply limiting federal courts' "jurisdiction or authority to enjoin or restrain the operation of" certain immigration laws, did not present a jurisdictional bar. Just two weeks ago, however, we repudiated their reasoning in *Garland* v. *Aleman Gonzalez*, 596 U. S. \_\_\_ (2022). Because we are a court of review and not first view, I would vacate and remand for the lower courts to reconsider their assertion of jurisdiction in light of *Aleman Gonzalez.*

\*    \*    \*

Section 1252(f)(1) provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" specified immigration provisions, except as applied to "an individual alien against whom proceedings under [those provisions] have been initiated." Some lower courts have narrowly interpreted this provision, holding that it does not bar relief that a plaintiff

frames as "requir[ing]" (rather than preventing) the Government's enforcement of or compliance with the covered immigration laws. *E.g.*, 20 F. 4th 928, 1004 (CA5 2021). In this case, that was the only ground pressed by respondents below and relied on by the lower courts to hold that §1252(f)(1) did not "ba[r] jurisdiction." *Ibid.*; see App. to Pet. for Cert. 184a; Brief for Appellees in No. 21–10806 (CA5), pp. 40–41. But we just rejected this interpretation in *Aleman Gonzalez*. There, we held that §1252(f)(1) deprives lower courts of "jurisdiction to entertain" requests for "injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions" (subject to an exception, indisputably inapplicable to this case, for a suit by an individual noncitizen in proceedings under those provisions). 596 U. S., at ___, ___ (slip op., at 1, 5).

In the normal course, we would vacate and remand this case for further proceedings in light of *Aleman Gonzalez*. Instead, the Court plows ahead to break new jurisdictional ground. Acting on a compressed timeline, it embraces a theory of §1252(f)(1) that—so far as I can tell—no court of appeals has ever adopted: that §1252(f)(1) limits only the lower courts' remedial authority, not their subject-matter jurisdiction. The only court of appeals to have addressed this theory rejected it. *Miranda* v. *Garland*, 34 F. 4th 338, 354–356 (CA4 2022). Still, the Court is confident enough to proceed based on short, barely adversarial supplemental briefs. (The United States' original brief devoted only a conclusory footnote to the jurisdictional question, and Texas and Missouri did not respond.) And these supplemental briefs are particularly unhelpful because, having been submitted prior to our decision in *Aleman Gonzalez*, they could not address that decision's significance for this case. In fact, they devoted a considerable portion of their allotted length to the issue that *Aleman Gonzalez* subsequently resolved.

This would all matter less if the jurisdictional question were easy or unimportant—but it is neither. The Court's opinion papers over difficult issues, as I will discuss below, and its jurisdictional holding is likely to affect many cases. See, *e.g.*, *Texas* v. *Biden*, \_\_\_ F. Supp. 3d \_\_\_, \_\_\_, 2022 WL 658579, *14 (ND Tex., Mar. 4, 2022) (§1252(f)(1) does not bar Texas' claim that the Federal Government is wrongly refusing to detain noncitizens to determine if they have COVID–19); Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order 8–9 in *Arizona* v. *CDC*, Civ. No. 6:22–cv–00885 (WD La., Apr. 22, 2022) (arguing that §1252(f)(1) prohibits a district court from constraining the Federal Government's removal discretion in litigation challenging termination of Title 42 order). We should not short circuit the ordinary process.

I have several doubts about the Court's analysis of §1252(f)(1). To begin with, the Court assumes that we face an either/or choice between subject-matter jurisdiction and remedial authority, with the former being only about a court's authority to decide merits questions and the latter being only about the relief a court can grant. *Ante*, at 9. This dichotomy makes the Court's job easier, because it can use the obvious point that §1252(f)(1) strips lower courts of remedial authority to establish that §1252(f)(1) does *not* strip them of subject-matter jurisdiction. But why is it a binary choice? I would think that Congress is free to link a court's subject-matter jurisdiction to its remedial authority. That is not so different from an amount-in-controversy requirement, which conditions a district court's ability to address the merits on the relief that the plaintiff seeks. See, *e.g.*, 28 U. S. C. §1332 (district courts have subject-matter jurisdiction over diversity cases only when the amount in controversy exceeds $75,000). And the redressability requirement of Article III itself establishes a tie between jurisdiction and remedies, because a court's inability to order effective relief deprives it of jurisdiction to decide the merits

of a question otherwise within its competence. See, *e.g.*, *California* v. *Texas*, 593 U. S. ___, ___ (2021) (slip op., at 7) (redressability "consider[s] the relationship between 'the judicial relief requested' and the 'injury' suffered"); *Los Angeles* v. *Lyons*, 461 U. S. 95, 105–107 (1983) (failure to allege sufficient likelihood of future injury deprives a federal court of Article III "jurisdiction to entertain [the count] of the complaint" seeking injunctive relief ).

So it seems to me quite possible that §1252(f )(1) withdraws subject-matter jurisdiction over cases seeking certain remedies. Indeed, while the Government has a theory for why the Court can reach the merits in this case, it characterizes §1252(f )(1) as imposing "jurisdictional limitations" that "speak to 'a court's *power*'" and "'can never be forfeited or waived.'" Supplemental Brief for Petitioners 19–20; see also *Miranda*, 34 F. 4th, at 354 (concluding that "§1252(f )(1) is a jurisdiction-stripping statute" that cannot be waived). If there is a reason to treat limitations on subject-matter jurisdiction and limitations on remedial authority as mutually exclusive—either in general or in this statutory scheme—the Court does not explain it.

The Court breezes past other questions too. Most notably, it gives surprisingly little attention to a phrase on which it places significant weight: §1252(f )(1)'s parenthetical exempting "the Supreme Court" from its general bar on "jurisdiction or authority." The parties hardly discuss this parenthetical, which does not appear to have an analogue elsewhere in the United States Code. The Court, however, takes the phrase as conclusive evidence that §1252(f )(1) does not deprive district courts of subject-matter jurisdiction over "non-individual claims under [the covered provisions]," because if it did, "no such claims could ever arrive at this Court, rendering the provision's specific carveout for Supreme Court injunctive relief nugatory." *Ante*, at 10.

While this interpretation has some surface appeal, the

Court does not explain how it would work. Does it mean that the restriction on remedial authority is subject to waiver or forfeiture, so that a lower court can sometimes properly enter non-individual injunctive relief that this Court can then review? That a district court has the authority to enter some kinds of non-individual relief (for example, a classwide declaratory judgment) and that this Court can enter different relief (for example, a classwide injunction) on review of that judgment? Or that this Court can enter an injunction on appeal if the district court *could* have entered at least one form of relief, even if it actually entered only relief that exceeded its authority?* Or perhaps the parenthetical serves the very different purpose of clarifying that §1252(f)(1) does not disturb any pre-existing authority this Court has under the All Writs Act or other sources. These are difficult questions, yet the Court does not address any of them.

Indeed, the Court explicitly chooses *not* to opine on some of the issues that might help explain the parenthetical's unusual reservation. See *ante*, at 12, n. 4. For example, the Court declines to decide whether the bar in §1252(f)(1) is subject to forfeiture, even though that is a defining feature

———————

*For instance, in this case, the States sought declaratory relief, injunctive relief, and vacatur of the Government's termination of the Migrant Protection Protocols, but the District Court expressly entered only the latter two. If the District Court could have issued a declaratory judgment, perhaps this Court could exercise appellate jurisdiction even if the District Court lacked authority to issue an injunction or vacatur. The Court suggests that this happened in *Nielsen* v. *Preap*, 586 U. S. \_\_\_ (2019), in which, it says, the District Court also awarded only injunctive relief. *Ante*, at 11. But the issue is more complicated than the Court lets on. *Preap* involved consolidated cases. In the first, the plaintiffs sought declaratory and injunctive relief, but the District Court entered only the latter. See *Preap* v. *Johnson*, 303 F. R. D. 566, 587 (ND Cal. 2014). In the second, however, the District Court entered "only [a] declaratory ruling," with no accompanying injunction. *Khoury* v. *Asher*, 3 F. Supp. 3d 877, 892 (WD Wash. 2014). So unlike today's case, *Preap* did not involve only a hypothetical declaratory judgment.

of nonjurisdictional rules. See, *e.g.*, *Hamer* v. *Neighborhood Housing Servs. of Chicago*, 583 U. S. ___, ___–___ (2017) (slip op., at 2–3). It reserves the question whether §1252(f)(1) bars declaratory relief, an issue on which there are conflicting views. Compare *Alli* v. *Decker*, 650 F. 3d 1007, 1013 (CA3 2011) (it does not bar declaratory relief), with *id.*, at 1019–1021 (Fuentes, J., dissenting) (it does), with *Hamama* v. *Adducci*, 912 F. 3d 869, 880, n. 8 (CA6 2018) (it depends). And it avoids a position on whether §1252(f)(1) prevents a lower court from vacating or setting aside an agency action under the Administrative Procedure Act. See 5 U. S. C. §706(2). Not that I fault the Court for holding back. Quite the contrary: The questions surrounding §1252(f)(1) are complex and deserve more attention than we can give them in this posture.

As a final touch, the Court asserts that our precedent has already charted this course. *Ante*, at 11–12. But the Court cannot muster much on that front. It cites a passing statement rejecting an inapposite argument that §1252(f)(1) is a jurisdictional *grant*, see *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 481 (1999), a brief discussion from a plurality opinion in a case where the §1252(f)(1) issue had not been briefed or argued by the parties in this Court, see *Nielsen* v. *Preap*, 586 U. S. ___, ___–___ (2019) (slip op., at 8–9), and a dissent, see *Jennings* v. *Rodriguez*, 583 U. S ___, ___ (2018) (opinion of BREYER, J.) (slip op., at 31). None provides a clear roadmap for this case.

*      *      *

Given all this, I would tread more carefully. We should let the lower courts be the first to address the substantial antecedent questions that §1252(f)(1) presents in light of our hot-off-the-presses decision in *Aleman Gonzalez*. I respectfully dissent.