(Slip Opinion)

# Reconsidering the Application of the Hyde Amendment to the Provision of Transportation for Women Seeking Abortions

This Office concluded in 2022 that the Hyde Amendment does not bar the Department of Health and Human Services from expending covered funds to provide transportation for women seeking abortions. Having been asked to reconsider, we now conclude that the Hyde Amendment prohibits the use of federal funds to provide ancillary services necessary to receive an abortion.

July 11, 2025

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL,
DEPARTMENT OF HEALTH AND HUMAN SERVICES

In the aftermath of the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S Ct. 2228 (2022), the Department of Health and Human Services (together with its predecessor agency, "HHS") took the view that it could use appropriated funds to provide transportation services for patients seeking an abortion even when Congress prohibited HHS from paying for the abortion itself. This Office agreed, reasoning that the Hyde Amendment—an appropriations rider prohibiting HHS from "expend[ing]" its appropriations "for any abortion"—encompasses only funds "directly expended for" the "discrete medical procedure" rather than indirect expenditures necessary for a patient to obtain an abortion. *Application of the Hyde Amendment to the Provision of Transportation for Women Seeking Abortions*, 46 Op. O.L.C. __, at *2 (Sept. 27, 2022) ("2022 Opinion").

On January 24, 2025, President Trump issued Executive Order 14182, instructing agencies to "end the forced use of Federal taxpayer dollars to fund or promote elective abortion." Exec. Order No. 14182, 90 Fed. Reg. 8751, 8751 (Jan. 24, 2025). Consistent with that order, you asked us to reconsider our 2022 Opinion on the view that the Hyde Amendment bars *all* "medical, quasi-medical, or non-medical costs or fees" associated with a given abortion. *See* Memorandum for the Office of Legal Counsel, from Sean R. Keveney, Acting General Counsel, HHS, *Re: Interpretation of the Hyde Amendment* at 1 n.1 (Feb. 17, 2025).

We agree that the 2022 Opinion took an unduly narrow view of the text of the relevant appropriations rider. We therefore think it appropriate to withdraw that opinion, which we consider to be inconsistent with the traditional tools of statutory interpretation employed by the Supreme Court and this Office.

# I.

## A.

For almost 50 years, Congress has enacted what is colloquially known as the Hyde Amendment—a rider in the annual appropriations bill for the Departments of Labor, Health and Human Services, and Education that restricts the use of federal funds for abortions except in very limited circumstances. *See* Edward C. Liu & Wen W. Shen, Cong. Research Serv., IF12167, *The Hyde Amendment: An Overview* at 1 (updated July 20, 2022) ("*Overview*").[1] First introduced in 1976 by Representative Henry Hyde of Illinois, the Hyde Amendment originally provided that "[n]one of the funds contained in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term." Departments of Labor and Health, Education, and Welfare Appropriation Act, 1977, Pub. L. No. 94-439, § 209, 90 Stat. 1418, 1434 (1976) ("1976 Act").[2]

For the first 15 years of the provision's existence, Congress continued to re-enact the Hyde Amendment using essentially the same formulation, albeit with some fluctuation in the breadth of its exceptions. *Compare* Departments of Labor and Health, Education, and Welfare Appropriations Act, 1979, Pub. L. No. 95-480, § 210, 92 Stat. 1567, 1586 (1978) (expanding the exception to include "procedures necessary for the victims of rape or incest"), *with* Departments of Labor, Health and Human Services, and Education and Related Agencies Appropriation Act, 1985, Pub. L. No. 98-619, § 204, 98 Stat. 3305, 3321 (1984) (allowing

---

[1] Although the Hyde Amendment does not generally apply to funding provided to other agencies or under other appropriations, "programs with such funding may still be subject to Hyde-like restrictions on abortion." *Overview* at 1–2. These programs include, for example, the Department of Defense, *see* 10 U.S.C. § 1093; the Department of Justice, *see* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. C, §§ 202–204, 138 Stat. 25, 153; and the Department of State, *see* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. K, §§ 7018, 7057(d)(2), 136 Stat. 49, 604–05, 669.

[2] While the Hyde Amendment was first enacted in 1976, it was effectively enjoined until 1980, when the Supreme Court held that its funding restrictions violate neither the Fifth Amendment nor the Establishment Clause of the First Amendment. *See Harris v. McRae*, 448 U.S. 297, 311–27 (1980). The Court contemporaneously upheld analogous state restrictions against similar constitutional challenges. *See Williams v. Zbaraz*, 448 U.S. 358, 368–70 (1980).

exceptions only "where the life of the mother would be endangered if the fetus were carried to term").

In 1993, Congress revised the Amendment's central prohibitory clause. Rather than prohibit HHS from "us[ing]" covered funds to "perform an abortion," the language was amended to state:

> None of the funds appropriated under this Act *shall be expended for any abortion* except when it is made known to the Federal entity or official to which funds are appropriated under this Act that such procedure is necessary to save the life of the mother or that the pregnancy is the result of an act of rape or incest.

Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1994, Pub. L. No. 103-112, § 509, 107 Stat. 1082, 1113 (1993) ("1993 Act") (emphasis added).

The 1993 change to the Hyde Amendment followed a concerted—and hotly contested—effort to remove the rider entirely. Opponents of the Amendment emphasized that "[b]asic health care for women includes the full range of reproductive services, including abortions," and that the Hyde Amendment "imposed Government policy in the most personal of decisions," "jeopardiz[ing] the health and lives of millions of American women." 139 Cong. Rec. 14,844 (1993) (statement of Rep. Lowey). They highlighted what they perceived to be the "hypocrisy" inherent in the idea that "women have the right to choose whether to have an abortion but, of course, if a woman cannot afford it," then the option is unavailable to her. *Id.* at 14,853 (statement of Rep. Nadler). They pointed out that while "[s]ome taxpayers may object to Federal money going to pay for abortion," there are many things that individual taxpayers do not like, and they "don't think twice about their insurance premiums paying for another policyholder's abortion." *Id.* at 14,855 (statement of Rep. Meek). And opponents of the Hyde Amendment perceived 1993 to be their time to act because they "ha[d] a pro-choice President who also support[ted] a bill free of all Hyde-type language," eliminating any "threat of a Presidential veto." *Id.* at 22,626 (statement of Sen. Murray).

Proponents of the Hyde Amendment were equally forceful in their continued support of the limitation on using taxpayer dollars for abortions. They emphasized that "[t]he Hyde Amendment has been credited with saving over 1 million American children." *Id.* at 14,854 (statement of Rep. DeLay). They highlighted that "[r]epeal of the Hyde Amendment

would result in taxpayer funding of at least 400,000 abortions in fiscal year 1994," contrary to the preferences of Americans who "strongly oppose[] Federal funding of abortion." *Id.* at 14,888 (statement of Rep. Vucanovich). And they insisted that "[r]egardless of one's position on this very controversial issue, . . . most Americans agree that taxpayers should not be forced to pay for abortions"—and that retaining the Hyde Amendment was essential to reflect this majority preference. *Id.* at 14,849 (statement of Rep. Inglis). Ultimately, the supporters of the Hyde Amendment prevailed.

In 1997, Congress further expanded the rider to provide that covered funds cannot be "expended" on any "health benefits coverage that includes coverage of abortion." Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-78, § 509(b), 111 Stat. 1467, 1516 (1997) ("1997 Act"). Congress clarified later that such health benefits include any "package of services covered by a managed care provider or organization pursuant to a contract or other arrangement." Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, app. A, § 508(c), 114 Stat. 2763, 2763A-70 (2000). That language has remained virtually unchanged in the HHS annual appropriations legislation through the current fiscal year. *See, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, §§ 506–507, 138 Stat. 460, 703 ("2024 Act").

## B.

In 2022, *Dobbs* "h[e]ld that *Roe* . . . must be overruled" and "the issue of abortion [returned] to the people's elected representatives." 142 S. Ct. at 2242–43. Shortly after, HHS asked this Office whether the Hyde Amendment allows HHS to pay for travel to obtain abortions that HHS cannot fund. At that time, we concluded that it did.

We began by observing that "expend" is a "term of art that generally describe[s] the . . . payment of funds." 2022 Opinion at *2 (alterations in original) (quoting *Effect of Spending Prohibition on HUD's Satisfaction of Contractual Obligations to ACORN*, 33 Op. O.L.C. 339, 340 (2009) ("*Effect of Spending Prohibition*")). The word "for," we reasoned, "indicate[s] the object, aim, or purpose of an action or activity." *Id.* (quoting *Jennings v. Rodriguez*, 138 S. Ct. 830, 845 (2018)). "[T]he term 'abortion,'" in turn, "refers to a discrete medical procedure or a discrete catego-

ry of medical procedures." *Id.* (citing *Abortion*, Black's Law Dictionary (11th ed. 2019)). "Taking these definitions together," we concluded that the phrase "expended for any abortion" extends only to "funds paid with the object, aim, or purpose of paying for the discrete medical procedure of abortion." *Id.* We found that "[t]he Hyde Amendment is therefore best read to prohibit only direct expenses for the procedure itself and not indirect expenses, such as those for transportation to and from the medical facility where the procedure is performed." *Id.*

Our 2022 Opinion concluded that the "Hyde Amendment's legislative history further confirms [this] interpretation of [the] text." *Id.* at *3. It noted that in 1997 Congress expanded upon the Hyde Amendment to also prohibit the use of covered funds "for health benefits coverage that includes coverage of abortion." *Id.* (quoting 1997 Act, § 509(b), 111 Stat. at 1516). It argued that this addition "would have been unnecessary" if "the phrase 'for any abortion' already covered activities as removed from the direct provision of abortion as transportation," since "[p]ayment for health insurance that covers abortion is more closely connected to the actual expenditure" of funds for the provision of an abortion than is transportation to or from an abortion. *Id.* The 2022 Opinion further asserted that comparable limitations on the use of covered funds of the Department of Justice ("DOJ") to "facilitate in any way the performance of" any abortion demonstrated that when Congress "want[s] to ensure that a prohibition reaches facilitation of abortion," such as coverage of transportation expenses, it "has been explicit." *Id.* at *5.

The 2022 Opinion, however, considered of little relevance the earlier, 1993 change in the Hyde Amendment's language from funds "used to perform abortions" to funds "expended for any abortion." *Id.* at *4. It concluded that these two facially distinct phrases are not "meaningfully different," pointing out that HHS used them interchangeably in regulatory language in 1978 and that there was no indication that Congress "intended the 1993 revision to the Hyde Amendment to prohibit *more* conduct." *Id.* Thus, it reasoned, interpreting the term "expended for any abortion" to reach only direct medical expenses was consistent with the Office's earlier precedent that found that an analogous prohibition on the Peace Corps' use of funds "to perform abortions" did not "[o]n its face . . . prohibit the use of funds to pay expenses, such as a per diem or travel expenses, that are incidental to the abortion." *See id.* at *6; *Peace Corps Employment Policies for Pregnant Volunteers*, 5 Op. O.L.C. 350,

357 (1981) ("*Peace Corps Employment Policies*"); *see also Overview* at 1–2 (discussing other "Hyde-like provisions").

## C.

Following the President's order to "end the forced use of Federal taxpayer dollars to . . . promote elective abortion," Exec. Order No. 14182, 90 Fed. Reg. at 8751, you asked us to reconsider whether the Hyde Amendment also prohibits HHS from expending covered funds to provide a patient with services necessary to receive an abortion.

You advised that the issue arises most frequently with respect to unaccompanied minors under the care of HHS's Office of Refugee Resettlement ("ORR"). Current regulations—though not statutes—require ORR to "ensure that all unaccompanied children in ORR custody . . . be provided with . . . access to . . . family planning services," including "transportation across State lines and associated ancillary services if necessary to access appropriate medical services, . . . regardless of whether Federal appropriations law prevents ORR from paying for the medical care itself." 45 C.F.R. § 410.1307(a), (c)(2). We understand that our 2022 Opinion has formed the basis for ORR to provide transportation for a number of minors to receive abortions in the last three years—including minors who reside in states where such procedures are illegal.

## II.

"We do not lightly depart from our precedents," and we do so only after "giv[ing] the views expressed in our prior opinion careful and respectful consideration." *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling*, 42 Op. O.L.C. 158, 159 (2018) ("*Reconsidering the Wire Act*"). For the reasons below, we conclude that the 2022 Opinion deviated from how courts and this Office analyze statutes when it dissected the phrase "expended for any abortion" into its constituent pieces and gave a narrow, and overly literal, view of each word without adequately considering the phrase as a whole and in context. Having reexamined the issue, we conclude that the Hyde Amendment is best read to prohibit the use of federal funds to provide ancillary services necessary to receive an abortion. The 2022 Opinion's contrary conclusion is withdrawn.[3]

---

[3] *See Discretion to Continue the Home-Confinement Placements of Federal Prisoners After the COVID-19 Emergency*, 45 Op. O.L.C. __, *2 (Dec. 21, 2021) ("*Home-Confinement Placements*") (reconsidering an earlier opinion "[b]ased upon a thorough

### A.

We "'start, of course, with the statutory text,' and proceed from the understanding that '[u]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.'" *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (alteration in original) (quoting *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006)). The Hyde Amendment currently provides that "[n]one of the funds appropriated in this Act . . . shall be expended for any abortion" or "for health benefits coverage that includes coverage of abortion" except where "the pregnancy is the result of an act of rape or incest," or "where a woman suffers from a physical disorder, physical injury, or physical illness . . . that would . . . place the woman in danger of death unless an abortion is performed." 2024 Act, §§ 506–507, 138 Stat. at 703.[4] The relevant issue is thus what it means for funds to be "expended for any abortion," and in particular whether the prohibition extends beyond funds directly expended for the abortion procedure. We think it does.

In approaching this question, the 2022 Opinion began by recognizing that "expend" is an appropriations "term of art" that "generally describe[s] the . . . payment of funds." 2022 Opinion at *2 (alterations in original) (quoting *Effect of Spending Prohibition*, 33 Op. O.L.C. at 340). It concluded that because the object of the prohibition was "any abortion," a "discrete medical procedure," the Hyde Amendment's applicability is limited to "direct expenses for the procedure itself" and does not extend to "indirect expenses." *Id.*

We are not of the view, however, that it is possible to determine the scope of the Hyde Amendment by examining each word in isolation. "[I]t is a 'fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation,

---

review of the relevant text, structure, purpose, and legislative history"); *Applicability of the Emoluments Clause to Non-Government Members of ACUS (II)*, 34 Op. O.L.C. 181, 191 (2010) (reconsidering a prior opinion where "recent precedents of the Office [were] in direct tension" with its conclusion).

[4] On March 15, 2025, Congress passed the Full-Year Continuing Appropriations and Extensions Act, which made available continuing appropriations for fiscal year 2025 "under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024." Pub. L. No. 119-4, div. A, § 1101, 139 Stat. 9, 10.

but must be drawn from the context in which it is used.'" *Textron Lycoming Reciprocating Engine Div., AVCO Corp. v. United Auto., Aerospace & Agric. Implement Workers of Am.*, 523 U.S. 653, 657 (1998) (quoting *Deal v. United States*, 508 U.S. 129, 132 (1993)); *see also EPA Acceptance and Use of Donations Under the Clean Air Act*, 33 Op. O.L.C. 389, 392 (2009) ("As the Supreme Court has explained, '[a]mbiguity is a creature not of definitional possibilities but of statutory context.'" (alteration in original) (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994))). Thus, "[i]t is not the meaning" of the words "for" or "abortion" "that we are seeking here, but the meaning of" the phrase "expended for any abortion." *See Textron Lycoming*, 523 U.S. at 657.

This contextual understanding is particularly important because the Hyde Amendment is a condition on an otherwise broadly worded appropriation of funds to HHS. Congress has the power of the purse, and "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7; 31 U.S.C. § 1301(a). At the same time, "government is a practical affair." *United States v. Midwest Oil Co.*, 236 U.S. 459, 472 (1915). We have long advised, and the Comptroller General has shared the view, that "it is not expected, nor would it be reasonably possible, that every item of expenditure be specified in the appropriation act." Government Accountability Office, *Principles of Federal Appropriations Law* 3-14, 3-15 (4th ed. 2017) ("*Red Book*"); *State and Local Deputation of Federal Law Enforcement Officers During Stafford Act Deployments*, 36 Op. O.L.C. 77, 87–88 (2012) ("*State and Local Deputation*") (noting that our Office's standard mirrors that of the Comptroller General). Instead, "defining the objects for which any particular appropriation was made recognizes an element of discretion seasoned by a statutory construction analysis and reference to the common meaning of the words." *Red Book* at 3-15.

For more than 15 years, Congress prohibited funds from being "used to perform abortions." *See* 1976 Act, § 209, 90 Stat. at 1434. In 1993, Congress *changed* the text of the Amendment to provide that no federal funds "shall be expended for any abortion." *See* 1993 Act, § 509, 107 Stat. at 1113.

Our 2022 Opinion acknowledged that the post-1993 language could have multiple possible definitions but concluded that the 1993 change did not meaningfully alter the scope of the Hyde Amendment's prohibition.

2022 Opinion at *2–4. We found informative HHS's interchangeable use of the two phrases in a 1978 rulemaking as well as the absence of any evidence in the congressional record that "Congress intended the 1993 revision to the Hyde Amendment to prohibit *more* conduct." *See id.* at *4 (citing, *inter alia*, 43 Fed. Reg. 4832, 4832, 4843 (Feb. 3, 1978)). This was in error.

"When words have several plausible definitions, . . . [s]tatutory history is an important part" of the "context [that] differentiates among them." *United States v. Hansen*, 143 S. Ct. 1932, 1942 (2023). The clearest indication of Congress's intent to change the meaning of the Hyde Amendment is the change in the text itself. "[W]hen Congress enacts a statute that uses different language from a prior statute, we normally presume that Congress did so to convey a different meaning." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 398 (2016) (Thomas, J., concurring in the judgment); *Crawford v. Burke*, 195 U.S. 176, 190 (1904) ("[A] change in phraseology creates a presumption of a change in intent").[5] This rule reflects a specific application of the well-established "meaningful-variation canon," which stands for the commonsense idea that "'[w]here [Congress] has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea.'" *Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1789 (2022) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012)).

On its face, the text of the post-1993 Hyde Amendment broadens the scope of the relevant prohibition. The phrase "used to perform abortions" from earlier versions of the Hyde Amendment is more obviously limited to direct medical expenses. In general usage, "to perform" means "[t]o begin and carry through to completion" a specific task. *Webster's II New Riverside University Dictionary* 873 (3d ed. 1994). In the context of a medical procedure, "performance" is "[a]n activity which achieves some result that is externally observable." 3 *International Dictionary of Medicine and Biology* 2133 (1986); *accord Dorland's Illustrated Medical Dictionary*

---

[5] There is an exception for when "stylistic" changes are made as part of a recodification. *DiFiore v. Am. Airlines, Inc*., 646 F.3d 81, 85 (1st Cir. 2011); *see also, e.g.*, Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 28:8 (7th ed. 2014). This exception is irrelevant because an appropriations rider is, by definition, not part of a recodification.

1350 (29th ed. 2000) (defining "performance" to mean, in part, "the execution of an action"). Thus, the prohibition on using funds for the performance of an abortion from the pre-1993 versions of the Hyde Amendment was more clearly cabined to those expenses related only to the "specific task"—the medical procedure itself. Our Office interpreted almost identical language in the Peace Corps' appropriations legislation to "[o]n its face . . . cover[] only payments made 'to perform abortions'" and "not prohibit the use of funds to pay expenses, such as a per diem or travel expenses, that are incidental to the abortion." *See Peace Corps Employment Policies*, 5 Op. O.L.C. at 357.[6]

Had Congress wanted to limit the Hyde Amendment to "funds directly expended for abortion procedures," *see* 2022 Opinion at *2, the pre-1993 language would have been in line with existing precedent from both Congress and this Office. But the phrase "expended for any abortion" is notably broader and thus belies such intent. As our 2022 Opinion acknowledged, funds expended "for" an abortion are those used with the "object, aim, or purpose of [that] action or activity." *Id.* (quoting *Jennings*, 138 S. Ct. at 845). The replacement of "used to perform" with "expended for" suggests that Congress no longer intended to limit the prohibition to funds used for the specific medical procedure. Rather, it understood the post-1993 Hyde Amendment to also encompass other associated costs that, while not directly involved in the *performance* of the abortion, are still incurred with the "object, aim, or purpose of" completing the procedure.

This conclusion is consistent with how appropriations riders are generally interpreted. "The established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress." *United States v. MacCollom*, 426 U.S. 317, 321 (1976). As a result, appropriations bills are given a practical construction that considers whether a particular expenditure "bears a logical relationship to the appropriation sought to be charged," *State and Local Deputation*, 36 Op. O.L.C. at 88 (quoting 1 *Red Book* at 4-21 (3d ed. 2004)), as well as whether that expense is "prohibited by

---

[6] For the avoidance of doubt, you did not ask us to, and we did not undertake to, reconsider this prior advice. Thus, nothing we say in this opinion should be interpreted either as an endorsement or a rejection of our advice in 1981, which depended not just on the phrase "to perform an abortion" but also an employment statute not relevant in the current context. *Peace Corps Employment Policies*, 5 Op. O.L.C. at 357–58.

law" or "otherwise provided for . . . within the scope of some other appropriation or statutory funding scheme," *Use of General Agency Appropriations to Purchase Employee Business Cards*, 21 Op. O.L.C. 150, 154 (1997) ("*Employee Business Cards*") (quoting 1 *Red Book* at 4-16 (2d ed. 1991)).[7] Although these principles are properly understood to preserve considerable flexibility for agencies, that discretion does not extend so far as to allow an agency to circumvent a clear, unequivocal prohibition on the use of federal funds to perform an activity by conducting preparatory steps *to* that activity that serve no purpose divorced *from* that activity so long as the agency stops just short of achieving its ultimate objective.[8]

Applying these principles to the facts presented in your question, we find the Hyde Amendment bars ORR from providing transportation to an unaccompanied child for the purpose of obtaining an abortion unless the abortion falls into one of the Amendment's enumerated exceptions. Current regulations require ORR to "ensure that all unaccompanied children in ORR custody . . . be provided with . . . access to . . . family planning services," 45 C.F.R. § 410.1307(a), and recognize that "transportation across State lines and associated ancillary services" may be "necessary to access" such "family planning services," *id.* § 410.1307(c)(2). Where such transportation services are necessary for an individual to obtain an abortion, the associated costs constitute the kind of indirect expense that the

---

[7] *E.g.*, *Employee Business Cards*, 21 Op. O.L.C. at 153 (recognizing "the basic rule that a general appropriation may be used to pay any expense that is necessary or incident to the achievement of the underlying objectives for which the appropriation was made" (quoting *Indemnification of Department of Justice Employees*, 10 Op. O.L.C. 6, 8 (1986))); *Red Book* at 3-15 (recognizing the "well-settled rule of statutory construction that where an appropriation is made for a particular object, by implication it confers authority to incur expenses which are necessary or proper or incident to the proper execution of the object" (quoting *Public Buildings, Erection—Temporary Storehouse*, 6 Comp. Gen. 619, 621 (1927))); *see also, e.g.*, *Ass'n of Civilian Technicians v. FLRA*, 370 F.3d 1214, 1221 (D.C. Cir. 2004) ("Under the 'necessary expense doctrine,' the Comptroller General has opined that expenditures not explicitly authorized in an appropriations act may nonetheless be lawful." (citing 6 Comp. Gen. at 621)).

[8] This analysis might be different if Congress were to provide an agency with multiple appropriations, only one of which is subject to a spending restriction, or if an agency's actions serve multiple purposes, only one of which is forbidden. Our 2022 Opinion, however, did not turn on any such nuances. We thus do not discuss them here beyond noting that they can exist and should be considered when determining whether an agency has complied with any particular funding restriction.

post-1993 Hyde Amendment limits. Under current circumstances, interstate transportation expenses could dwarf the cost of the abortion procedure itself. It would thus be inconsistent with longstanding congressional policy—as reflected in the Hyde Amendment's textual bar on "expend[itures] for any abortion"—for HHS to fund such expenses merely because they do not go directly to the person or entity performing the abortion.

## B.

To the extent a reader is inclined to look further, our conclusion is consistent with the larger context of the abortion debate in 1993. *See Biden v. Texas*, 142 S. Ct. 2528, 2542 (2022) ("The historical context in which the provision was adopted confirms the plain import of its text.").[9] The 2022 Opinion cites statements in a floor debate reflecting that some members of Congress would have preferred a narrower reading of the Hyde Amendment—or no Hyde Amendment at all. *See* 2022 Opinion at *3. But it was the *proponents* of the Hyde Amendment who ultimately prevailed. Those proponents vigorously advocated that the prohibition was essential "to reflect the wishes of the majority of Americans that tax dollars not be spent to fund abortion on demand." 139 Cong. Rec. at 14,856 (statement of Rep. Vucanovich). They cited polling data that "consistently found majorities [of Americans] opposing public financing of abortion on demand." *Id.* at 14,852 (statement of Rep. Smith). And they explained that maintaining the prohibition on federal funding for abortions was essential to making abortion "rare," reasoning that "[w]hen you subsidize something, you get more of it . . . . That is economics 101." *Id.* at 14,856 (statement of Rep. Hyde).[10] These concerns reflected the contemporaneous nationwide surge in the pro-life movement in the United States, aimed

---

[9] For the avoidance of doubt, our conclusion does not turn on what any particular legislator said during debates over the Hyde Amendment. This discussion is included solely to demonstrate that the 2022 Opinion did not grapple with the full scope of the arguments aired during those debates, leading it to adopt an interpretation of the phrase "expended for any abortion" that was based on a selective analysis of the legislative history.

[10] *See also, e.g.*, 139 Cong. Rec. at 14,854 (statement of Rep. DeLay) (arguing against, "as a matter of government, underwrit[ing] by paying for abortions"); *id.* at 22,640 (statement of Sen. Nickles) (opposing Medicaid-funded abortion as forcing "partial State funding of abortions" even where states had banned such funding).

at enforcing existing laws and enacting new ones restricting the availability of abortion.[11]

This focus on preventing federal money from subsidizing abortions is inconsistent with the notion that Congress meant to cabin the Hyde Amendment only to expenses associated with the actual procedure.[12] Rather, it supports the understanding that Congress wanted federal money kept "out of the abortion business" altogether. 139 Cong. Rec. at 14,890 (statement of Rep. Emerson).

Executive practice in related areas further comports with our current view. Section 1008 of Title X of the Family Planning Services and Population Research Act of 1970, 42 U.S.C. §§ 300 *et seq*., provides federal funding for family-planning services but prohibits those funds from "be[ing] used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. In the annual appropriations bill for Title X, Congress has reiterated that "amounts provided to" "the program under title X . . . shall not be expended for abortions"—language that mirrors the current Hyde Amendment. *See* 2024 Act, div. H, tit. II, 136 Stat. at 444.

HHS has "for much of [Title X's] history" understood these twin limitations to prohibit a program receiving Title X funds from "tak[ing] further affirmative action (such as negotiating a fee reduction, making an appointment, [or] *providing transportation*) to secure abortion services for [a] patient." Ensuring Access to Equitable, Affordable, Client-Centered,

---

[11] *See* Michael New, *Analyzing the Effects of State Legislation on the Incidence of Abortion During the 1990s*, Heritage Found. (Jan. 21, 2004), https://www.heritage.org/marriage-and-family/report/analyzing-the-effects-state-legislation-the-incidence-abortion-during; Terry Sollom, *State Actions on Reproductive Health Issues in 1994*, 27 Persps. on Sexual & Reprod. Health 83 (1995).

[12] Such a reading is particularly implausible when it comes to medication abortion, which has accounted for the majority of all abortions in the U.S. in recent years. *See, e.g.*, Rachel K. Jones & Amy Friedrich-Karnik, *Medication Abortion Accounted for 63% of All US Abortions in 2023—an Increase from 53% in 2020*, Guttmacher Inst. (Mar. 19, 2024), https://www.guttmacher.org/2024/03/medication-abortion-accounted-63-all-us-abortions-2023-increase-53-2020. Until *Dobbs*, abortion advocates repeatedly challenged state health and safety regulations precisely because the cost of providing such protections could outstrip the cost of the medication itself. *See, e.g.*, *Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 919 (7th Cir. 2015); *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 497 (6th Cir. 2012).

Quality Family Planning Services, 86 Fed. Reg. 56,144, 56,150 (Oct. 7, 2021) (quoting Provision of Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,281, 41,281 (July 3, 2000)) (emphasis added). Citing both the Title X-specific rider and the Hyde Amendment, HHS has elaborated that "it is not under a duty to subsidize abortion," and "it is prohibited from doing so." *Id.* While we are not bound by HHS's interpretation of its own Title X authorities, a "longstanding practice of the government . . . can inform [a] determination of what the law is." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2258 (2024) (quotation marks omitted). And here, that practice is consistent with what we understand it to be: By barring funds from being "expended for any abortion," both Title X and the Hyde Amendment prohibit HHS from paying for transportation necessary to obtain such an abortion.

## C.

Nor do we find the remaining counterarguments persuasive enough to overcome either the plain text or the statutory history of the Hyde Amendment.

*First*, our 2022 Opinion found informative the fact that in 1997, Congress revised the Hyde Amendment to add that covered funds cannot be expended "for health benefits coverage that includes coverage of abortion." 2022 Opinion at *3 (quoting 1997 Act, § 509(b), 111 Stat. at 1516). We asserted that "[p]ayment for health insurance that covers abortions is more closely connected to the actual expenditure for or provision of abortions than transportation to and from the procedure." *Id.* We then reasoned that "[i]f the phrase 'for any abortion' already covered activities as removed from the direct provision of abortion as transportation . . . , then the additional statutory language would have been unnecessary." *Id.*

We do not agree with that logic. To begin with, we think it dubious to assert that abortion-transportation services are less "closely connected" to abortion than health insurance that covers abortions. Health insurance that covers abortion generally also covers a range of other services as well, the

vast majority of which have nothing to do with abortion.[13] By contrast, abortion-transportation services directly support obtaining abortions and nothing else. That Congress clarified in 1997 that federal funds cannot be used for health insurance that includes abortion coverage thus says nothing about whether the Hyde Amendment already barred paying for transportation to an abortion.

Even if we were to agree that health benefits coverage is more closely related to an abortion procedure than is the payment of transportation expenses, the rule against superfluity is not an unwavering command, and "[r]edundancy is not a silver bullet." *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019). Sometimes Congress deliberately "employ[s] a belt and suspenders approach" to clarify what a statute permits. *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1350 n.5 (2020) (citing *Rimini Street*, 139 S. Ct. at 881). Here, the 1997 amendment was likely a response to exogenous changes in the larger health care industry. The early 1990s saw a spike in Medicaid expenditures, which led states to experiment with financing Medicaid using a managed-care rather than a fee-for-service methodology. *See* Paul J. Boben, *Medicaid Reform in the 1990s*, 22 Health Care Fin. Rev. 1 (2000). Under this model, Medicaid programs pay private companies a per-month capitation rate based on a "defined package of benefits" rather than reimbursing for individual services. *Medicaid Managed Care Capitation Rate Setting*, *supra* note 13, at 1. Thus, the 1997 addition to the Hyde Amendment clarifies that this package of benefits was not to include abortion services.

*Second*, our 2022 Opinion found informative the contrast between the Hyde Amendment and a similar rider in the appropriations language for DOJ. *See* 2022 Opinion at *4–5. That rider spans three statutory provisions:

- Section 202 generally prohibits using covered funds "to pay for an abortion." Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. B, § 202, 138 Stat. 25, 153.

---

[13] Medicaid & CHIP Payment & Access Comm'n, *Medicaid Managed Care Capitation Rate Setting* at 3–5 (Mar. 2022), https://www.macpac.gov/wp-content/uploads/2022/03/Managed-care-capitation-issue-brief.pdf (explaining how capitation rates are set for Medicaid managed care plans).

- Section 203 provides that "[n]one of the funds appropriated under this title shall be used to require any person to perform, or facilitate in any way the performance of, any abortion." *Id.* § 203.

- Section 204 clarifies that "[n]othing in the preceding section shall remove the obligation of the Director of the Bureau of Prisons [("BOP")] to provide escort services necessary for a female inmate to receive such service outside the Federal facility." *Id.* § 204.

We reasoned that "when Congress has wanted to ensure that a prohibition reaches facilitation of abortion, Congress has been explicit, stating that no covered funds 'shall be used to . . . facilitate in any way the performance of[] any abortion.'" 2022 Opinion at *5 (emphasis omitted). We noted that because "the Hyde Amendment does not include a similar elaboration," there was a "strong indication that it should not be read to encompass indirect funding." *Id.* (citing *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 777 (2018)).

But, as the 2022 Opinion acknowledges, DOJ faces "special issues" relating to the provision of health care, due to BOP's "custodial role." *Id.* at *6. Because "[a]n inmate must rely on prison authorities to treat his medical needs," the government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976). That obligation, however, does not extend to every form of health care that a prisoner may desire, *see Farmer v. Brennan*, 511 U.S. 825, 840–47 (1994), and may require the exercise of considerable discretion, *see, e.g.*, *Brown v. Plata*, 563 U.S. 493, 538 (2011); *see also Gibson v. Collier*, 920 F.3d 212, 226 (5th Cir. 2019) ("We see no basis in Eighth Amendment precedent . . . to hold a state official deliberately (and unconstitutionally) indifferent, for doing nothing more than refusing to provide [gender-reassignment surgery]."). The more explicit phrasing of DOJ's rider is therefore best understood as an effort to "make . . . crystal clear rather than just clear," *In re Collins*, 170 F.3d 512, 513 (5th Cir. 1999), that whatever discretion BOP has in providing health care does not extend to facilitating an abortion. *Atl. Richfield Co.*, 140 S. Ct. at 1350 n.5.

Nor do we now understand section 204 to suggest that "when Congress prohibits funds from being used or expended for abortion, as in section 202, . . . Congress does not intend for that prohibition to reach transportation expenses." 2022 Opinion at \*6. Section 204 is specific to escort services provided by BOP—not transportation expenses for inmates themselves. Where an inmate must travel, for example, across state lines to obtain an abortion, section 204 may require BOP to provide escort services for that inmate but not necessarily to pay for the inmate's own transportation costs. We therefore read section 202's prohibition—which is echoed in the Hyde Amendment—to prohibit payment of transportation expenses.

### III.

We do not depart from our past views lightly. Our Office embraces a "long tradition of general adherence to Executive Branch legal precedent, reflecting strong interests in efficiency, institutional credibility, and the reasonable expectations of those who have relied on our prior advice." *Reconsidering the Wire Act*, 42 Op. O.L.C. at 177. But, "as with any system of precedent," reconsideration of our prior opinions is appropriate where, for example, we have "identif[ied] errors in the supporting legal reasoning." *Id.* at 177–78; *see also, e.g.*, *Home-Confinement Placements*, 45 Op. O.L.C. at \*1–2; *Statutory Rollback of Salary to Permit Appointment of Member of Congress to Executive Office*, 33 Op. O.L.C. 201, 201–02 (2009). For the reasons discussed above, this is such a case. Having concluded that the Hyde Amendment prohibits the expenditure of federal funds for the transportation expenses at issue, the appropriate response is to withdraw our prior contrary opinion.

LANORA C. PETTIT
*Deputy Assistant Attorney General*
*Office of Legal Counsel*